**NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION, Appellant,**

**v.**

**CRIM TRUCK & TRACTOR COMPANY, Travis Crim and Tim Farley, Appellees.**

**No. 06–93–00104–CV.**

Court of Appeals of Texas, Texarkana.

Argued July 12, 1994.

Decided July 15, 1994.

Rehearing Denied Aug. 16, 1994.

Stephen F. Fink, Thompson & Knight, Dallas, for appellant.

J. Mitchell Beard, Ron Adkison, Wellborn, Houston, Adkison, Mann, Henderson, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Navistar International Transportation Corporation appeals from a judgment rendered in favor of Crim Truck & Tractor Company (CT & T), Travis Crim, and Tim Farley. In an earlier decision, we reversed a judgment in this same suit and remanded the cause for a new trial, and our decision was affirmed by the Texas Supreme Court. *See Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co.*, 791 S.W.2d 241 (Tex.App.—Texarkana 1990), *aff'd*, 823 S.W.2d 591 (Tex.1992). We find that the evidence is insufficient to support the damages verdict and that there are several errors in the trial court's evidentiary rulings. Therefore, we reverse and remand this case to the trial court.

CT & T and its owners, Travis Crim and Tim Farley, sued Navistar for breach of a franchise agreement. CT & T had a long-standing relationship with Navistar International Transportation Corporation, formerly International Harvester Company, and was the franchise dealer for Navistar's truck products. The franchise agreement provided that Navistar could unilaterally terminate the franchise only if CT & T breached certain conditions in the agreement.

In 1984, Navistar developed a computerized communications network, called the Dealer Communications Network, to link the company with its dealers. Navistar sent each of its dealers a Dealer Communications Network Agreement. According to Navistar, execution of the agreement to join the network was mandatory. CT & T did not execute the agreement or attend the meeting Navistar had with its dealers to explain the network. Navistar informed CT & T that it considered CT & T to be in anticipatory breach of the franchise agreement. CT & T refused to comply with Navistar's repeated requests to sign the network agreement, and Navistar terminated CT & T's truck franchise on April 1, 1985. Crim and Farley soon dissolved their company.

CT & T, Crim, and Farley filed suit against Navistar in March of 1987 seeking damages under both tort and contract theories. The jury found against Navistar on all questions, and Navistar appealed. This court reversed and rendered judgment that CT & T take nothing on its tort claims, but remanded the case for a new trial on the contract issues. *Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co.*, 791 S.W.2d 241 (Tex.App.—Texarkana 1990), *aff'd*, 823 S.W.2d 591 (Tex.1992). At the second trial, the jury found that Navistar breached the franchise agreement and awarded CT & T approximately $2.3 million for past and future lost profits.

### Evidence of Damages

■ Navistar complains that the damages awarded by the jury are excessive as a matter of law or not supported by factually sufficient evidence. Part of Navistar's complaint is based on the fact that the sum awarded includes income and expenses attributable to CT & T's wood-hauling business—a business separate from CT & T's new truck sales. The issue of the sufficiency of the evidence also overlaps other complaints of both Navistar and CT & T regarding the exclusion of certain expert opinion testimony each party offered on the issue of damages.

■ In determining a no evidence point, we consider only the evidence and inferences which tend to support the verdict and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456 (Tex.1992). If there is any evidence of probative force to support the finding, the point is overruled and the finding upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). If the no evidence point is overruled, we next consider, weigh, and examine all of the relevant evidence. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex.1989). We set aside the verdict only if the evidence is so weak that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175 (Tex.1986).

CT & T's expert witnesses prepared a report estimating that CT & T suffered a past loss from termination of the franchise of $839,509.00 and a future loss of $1,539,009.00, for a total loss of $2,378,518.00. These are the amounts awarded by the jury; however, the expert's calculations include income and expenses of CT & T's wood-hauling business, sometimes referred to as the "Truck Sales Program," as well as the truck franchise. CT & T argues that these amounts were properly included in the damages report based upon the testimony of one of its experts to the effect that wood hauling was an integral part of the total trucking operation. This court previously held that there was insufficient evidence to prove damages from the loss of the franchise with reasonable certainty because the testimony went to the profits generated by the entire business entity, including the agricultural and wood-hauling operations. *Navistar*, 791 S.W.2d at 244.

Other than the expert opinion that the lost profits from the wood-hauling business were properly considered as part of CT & T's damages, CT & T again has presented no evidence to show the amount of damages attributable solely to the termination of the franchise. We find that there was insufficient evidence to prove damages from the loss of the franchise with reasonable certainty.

### Evidentiary Rulings

Navistar contends that the trial court erred in excluding expert testimony it offered to rebut the accuracy of a damages

report prepared and presented by CT & T's experts. In a cross-point, CT & T asserts that the trial court erred by excluding testimony from one of its experts who would have revised the amount of damages estimated in the report by deleting income attributable to CT & T's wood-hauling business.

*Navistar's Expert*

██ Navistar called Sam Rhodes, a certified public accountant, to testify as an expert witness on the issue of CT & T's damages. Rhodes was to testify about problems he had with the damages report prepared by CT & T's experts. The trial court excluded most of Rhodes' testimony, along with three graphs and charts Rhodes had prepared to illustrate problem areas in CT & T's report, because Rhodes' deposition testimony was not supplemented to include his opinions about the report provided by CT & T's experts.[1] During the trial, Rhodes criticized CT & T's experts for including interest income and investment income in calculating CT & T's revenues because such income is not "operating types of income," and for including income from the Truck Sales Program, which was a separate trucking and wood-hauling business that did not involve new truck sales. Rhodes also criticized the report because it added back in depreciation and shareholder benefits when calculating the cash benefits the shareholders would receive. Adding these amounts back in increased CT & T's damages and the damages suffered by Crim and Farley. Rhodes, however, was not allowed to put "hard numbers" to his criticisms

and illustrate for the jury the difference this would make to CT & T's damages.[2]

Rhodes' deposition was taken April 16, 1993. Trial began on May 3, 1993. At his deposition, Rhodes testified about the net profit for CT & T's truck business for the years 1982–1984 and indicated that he expected to be called upon at trial to rebut testimony put on by CT & T regarding the value of the truck franchise. Rhodes also sat in on the depositions of CT & T's experts. CT & T's counsel then resumed deposing Rhodes and asked Rhodes: "In the last couple of hours, have you formulated any new opinions in this case?" Rhodes replied:

> Not specifically. After hearing these depositions, I need to go through the numbers that were prepared here and analyze them and see where I have problems and concerns. I do have some problems and concerns; but I don't have any new opinions as of yet.

CT & T's attorney replied, "Okay" and ended the deposition without asking Rhodes about the nature of his problems and concerns with the other experts' calculations.

When Navistar began questioning Rhodes at trial about his problems with CT & T's damages report, CT & T's counsel objected. The trial court held a hearing on the matter, then called a recess and ordered CT & T to depose Rhodes on the opinions he had formed after his deposition was taken. CT & T deposed Rhodes that afternoon. The next morning, CT & T renewed its objection. CT

---

1. Rhodes had also wanted to comment that CT & T sold its agricultural business in 1985 for $160,-000.00. By comparing the sale price of the agricultural business with the value CT & T's experts placed on the truck franchise, Navistar wanted to show that CT & T's damages report was a gross exaggeration. The agricultural side of the business brought in about the same amount of annual revenue as the franchise, and CT & T argues that the $160,000.00 reflects the fair market value of a future stream of profits. The sale of the agricultural business, however, was a "fire sale" done under duress to generate income and prevent CT & T from losing its dealership. *See City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972) (defining "fair market value" as the amount a willing buyer, who desires to buy, but is under no obligation to buy, would pay to a willing seller, who desires to sell, but is under no obligation to sell).

Furthermore, it appears that the jury was provided with substantially the same information through the testimony of Travis Crim. Crim testified that the breakdown in income from the truck and agricultural sides of the business was roughly 60/40, or 50/50 in some years. Crim then testified that the goodwill of the agricultural business, plus an overhead crane or two and a couple of jacks, was sold for $160,000.00.

2. Regarding the charts (labelled DX 14, 15, and 16) Rhodes prepared for illustrative purposes, Rhodes readily admitted that Exhibit 16 merely graphs the same numerical data contained in the appendices to CT & T's damages report, which was already admitted into evidence. Exhibits 14 and 15, however, illustrate (in dollars) the five adjustments to this damages report that Rhodes thought needed to be made.

& T argued that a deposition is a discovery response just like any other form of discovery which a party has a duty to supplement. *See* TEX.R.CIV.P. 166b(1) (listing forms of discovery). The trial court sustained the objection and excluded Rhodes' opinions, graphs, and charts that were not disclosed at the time of his original deposition or by supplementation.

There are no Texas cases that specifically require a deponent to supplement his deposition testimony. *See Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623, 630 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (refusing to address whether the duty to supplement extends to deposition testimony); *Am-Sav Group v. American Sav. and Loan Ass'n*, 796 S.W.2d 482, 486 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (noting that there are no reported Texas cases specifically addressing a party's duty to supplement the testimony and evidence produced at a deposition). Nor is there a procedural rule that requires a nonparty deponent to supplement his deposition testimony. A party has a general duty, however, to supplement his discovery responses when the party knows that the response was incorrect or incomplete when made, or knows that the response, though correct and complete when made, is no longer true and complete and the circumstances are such that the failure to amend the answer is in substance misleading. TEX.R.CIV.P. 166b(6)(a); *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993). The discovery rules do not prevent experts from refining calculations and perfecting reports through the time of trial, but the duty to supplement does require that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading. *Exxon*, 868 S.W.2d at 304.

Rhodes' testimony at his first deposition indicated that he expected to rebut the testimony of CT & T's experts and also that he had problems and concerns with their experts' report. Even assuming—without holding—a party must supplement the depositions of its witnesses, that duty arises only if the failure to do so would be misleading. TEX.R.CIV.P. 166b(6)(a)(2). Here, there was not so much a material change in Rhodes' testimony as there was an expansion on an already disclosed subject.

CT & T failed to diligently pursue this matter. CT & T knew that Rhodes had or expected to have an opinion regarding the damages calculations performed by CT & T's own experts. CT & T's attorney could have, at the time of Rhodes' deposition, recorded a stipulation regarding the duty to supplement. TEX.R.CIV.P. 166b(6)(c), 166c; *see also Am-Sav*, 796 S.W.2d at 487 (deponent agreed to furnish his calculations to opposing party as soon as they were complete). After Rhodes stated during his deposition that he did have problems and concerns with the damages report prepared by CT & T's experts, CT & T could have inquired about these "problems and concerns," if not by asking further questions at the deposition, then by subsequently asking for additional information once Rhodes had time to review the report. TEX.R.CIV.P. 166b(6)(c). CT & T could also have asked the trial court to order supplementation or order that Rhodes' opinions be reduced to tangible form and provided to CT & T within a reasonable time before trial.[3] TEX.R.CIV.P. 166b(2)(e)(4), 166b(6)(c). CT & T did not use any of these alternatives.

The trial court abused its discretion in excluding Rhodes' testimony as being a new opinion not disclosed in compliance with the rules of discovery.

*CT & T's Expert*

CT & T, although continuing to assert that its damages report was correct, wanted to introduce testimony from one of its experts, Sydney Smith, concerning what CT & T's damages would be if the income and expenses attributable to the wood-hauling business were deleted from the report.

---

**3.** CT & T asked Navistar for any written expert reports, but Navistar responded that none was available at that time. CT & T's request was not a basis for the trial court's ruling to exclude Rhodes' testimony. Furthermore, Rhodes never prepared a written report, so there was nothing to be produced.

While Smith did testify that these adjustments could easily be made, the trial court refused to allow Smith to testify about CT & T's damages under the revised report. Smith wanted to testify that CT & T's total damages would be $2,193,231.00 if the income and expenses of the wood-hauling business were excluded. The trial court excluded this evidence as being new opinion testimony not disclosed at the time of Smith's deposition.

Smith simply took the numbers in the damages report and deleted the data attributable to the wood-hauling operations. The damages report was already in evidence and Smith, during his deposition, had referred to CT & T's "Truck Sales Program" and the income from that program. Making relatively minor mathematical changes to a report that is already in evidence does not convert Smith's testimony into new opinion testimony. Furthermore, Smith made his changes in response to criticisms of Navistar's own expert, Sam Rhodes. Navistar could not have been prejudiced by Smith subtracting numbers that Navistar argued should not have been included in the first place. The trial court abused its discretion in excluding Smith's testimony as being a new opinion not disclosed during his deposition.

■ Error in excluding evidence is reversible if it was reasonably calculated to cause and probably did cause rendition of an improper judgment. Tex.R.App.P. 81(b)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). The trial court did not allow Rhodes to present his alternative damages calculations to controvert the accuracy of CT & T's experts' damages report, a report that the jury must have found highly persuasive given that the jury's award of damages was precisely the amount recommended in that report. By excluding Smith's testimony, the trial court left the jury with no adequate evidence on which to determine the issue of damages caused by Navistar's breach of contract.[4] The errors in excluding the experts' testimony were reasonably cal-

culated to cause and probably did cause rendition of an improper judgment.

### Other Questions

Navistar raises other points complaining of the trial court's granting a motion for continuance, the trial court's refusal to instruct the jury on how to construe the parties' contract, CT & T's failure to mitigate damages, and questions concerning prejudgment interest. These points are overruled. Navistar also complains about the trial court's admission of evidence of Navistar's motives for terminating the franchise. We find some trial court error in admitting irrelevant evidence of motive, but find that it is not reversible error because other similar evidence was before the jury without objection.

The trial court's judgment is reversed and the cause is remanded for a new trial.

---

4. The jury even sent out a question during its deliberations asking what the damages total in CT & T's expert report would be if the logging income was deducted from past and future loss-es. The trial court referred the jury to the closing arguments of CT & T's counsel, which, besides not being evidence, had no support in the evidence.