NO. 07-01-0007-CR


NO. 07-01-0008-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO


 

PANEL A



DECEMBER 18, 2001



______________________________




LEWIS DENNIS RICHARDSON, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;



NO. 40,170-A; 40,171-A; HONORABLE DAVID GLEASON, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

 In appellate cause No. 07-01-0007-CR appellant Lewis Dennis Richardson appeals
from his adjudication of guilt for aggravated assault on a public servant, the revocation of
his community supervision, and sentence of incarceration for 30 years. In appellate cause
No. 07-01-0008-CR appellant appeals from his adjudication of guilt for aggravated assault
with a deadly weapon, the revocation of his community supervision, and sentence of
incarceration for 15 years. We dismiss for lack of jurisdiction.


 On August 16, 1999, appellant pled guilty in cause No. 40,170-A in the 47th District
Court of Potter County ("the trial court") to the charge of aggravated assault on a public
servant. Honoring a plea bargain between the State and appellant, the trial court deferred
adjudicating appellant guilty and placed him on community supervision for ten years. 

 On August 16, 1999, appellant also pled guilty in cause No. 40,171-A in the trial
court to the charge of aggravated assault with a deadly weapon. Again honoring a plea
bargain between the State and appellant, the trial court deferred adjudicating appellant
guilty and placed him on community supervision for ten years. 

 On March, 2, 2000, the State filed a Motion to Proceed With Adjudication of Guilt
on Original Charge in each of the causes. On March 8, 2000, an alias capias was issued
in each cause for the arrest of appellant on the respective motions to adjudicate. Each
alias capias was executed and appellant was arrested on July 10, 2000. 

 The State's motions to adjudicate were heard together on December 7, 2000. The
trial court adjudicated appellant guilty as to each charge. Appellant was sentenced to
incarceration in the Texas Department of Criminal Justice-Institutional Division for 30 years
in cause No. 40,170-A and for 15 years in cause No. 40,171-A. On December 29, 2000,
appellant filed a general notice of appeal in each cause. On July 17, 2001, appellant filed
an Amended Notice of Appeal in each cause. In each amended notice he states that the
appeal is for jurisdictional defect "as a result of the failure to issue capias or warrant for
arrest, as required." He jointly briefed and jointly presents his appeals from the convictions
and sentences. The issues presented address each cause in the same manner. 

 Appellant asserts that the trial court lacked both jurisdiction and authority to proceed
on the State's motions to adjudicate and to revoke his community supervision because
proper issuance and service of an alias capias or warrant for his arrest was not effected
as to each motion. The State's response is threefold: (1) the record does not factually
support appellant's contentions; (2) jurisdiction of the appellate court has not been
invoked, and the appeals should be dismissed for lack of jurisdiction; and (3) the trial court
had jurisdiction to hear all the State's motions regardless of the issuance of capias or
arrest warrant as to the particular motion in question. 

 There is no constitutional right to appellate review of criminal convictions. Perez
v. State, 938 S.W.2d 761, 762 (Tex.App.--Austin 1997, pet. ref'd). The right to appeal is
conferred by the legislature, and a party may appeal only that which the legislature has
authorized. Galitz v. State, 617 S.W.2d 949, 951 (Tex.Crim.App. 1981). In a criminal
case, appeal is perfected by timely filing a notice of appeal. Tex. R. App. P. 25.2(a). (1) A
defective attempt to perfect appeal from a conviction fails to invoke the jurisdiction of the
appellate court. See Olivo v. State, 918 S.W.2d 519, 523 (Tex.Crim.App. 1996). The
appellate court then has no jurisdiction over the appeal and must dismiss the matter. See
Slaton v. State, 981 S.W.2d 208, 210 (Tex.Crim.App. 1998). 

 The notice of appeal must be filed within 30 days after the day sentence is imposed
or after the day the trial court enters an appealable order, unless a timely motion for new
trial is filed. TRAP 26.2(a). The notice of appeal must be in writing and must contain the
necessary jurisdictional allegations. See TRAP 25.2(b); State v. Riewe, 13 S.W.3d 408,
410 (Tex.Crim.App. 2000). An untimely notice of appeal or a notice of appeal which does
not conform to jurisdictional requirements or contain jurisdictional assertions will not invoke
the jurisdiction of the court of appeals. See id. at 411, 413-14. If an appeal is not timely
perfected, a court of appeals can take no action other than to dismiss the appeal. See
Slaton, 981 S.W.2d at 210. TRAP 25.2(d) does not permit an appellate court to grant a
motion to amend the notice of appeal outside the time limits to perfect appeal if the
amendments sought to be made to the notice of appeal are jurisdictional amendments. 
See Riewe, 13 S.W.3d at 413-14. For, once jurisdiction is lost, an appellate court lacks
the power to invoke any rule to thereafter obtain jurisdiction. Id. at 413.

 The requirements of TRAP 25.2(b)(3) apply to a defendant who plea bargains for
deferred adjudication. See Vidaurri v. State, 49 S.W.3d 880, 883 (Tex.Crim.App. 2001)
(application of TRAP 25.2(b)(3) is triggered by nature of original plea bargain process, not
whether defendant pled true or not true to allegations of motion to revoke probation);
Brown v. State, 943 S.W.2d 35, 41 (Tex.Crim.App. 1997) (construing former TRAP
40(b)(1)). In the absence of some express agreement between the prosecutor and the
defendant limiting the punishment to be assessed in the event of a subsequent
adjudication of defendant, when the prosecutor recommends deferred adjudication in
exchange for a defendant's plea of guilty or nolo contendere and deferred adjudication is
granted, then the trial judge does not exceed the recommendation if, upon proceeding to
an adjudication of guilt, the judge later assesses any punishment within the range allowed
by law. Watson v. State, 924 S.W.2d 711, 714 (Tex.Crim.App. 1996); see Ditto v. State,
988 S.W.2d 236, 239-40 (Tex.Crim.App. 1999). 

 In the matters before us, appellant's original general notices of appeal did not serve
to invoke our jurisdiction. See Vidaurri, 49 S.W.3d at 883 and Riewe, 13 S.W.3d at
413-14. The amended notices were not timely to invoke our jurisdiction, and we may not
allow amendment of the notices of appeal if the amendments sought to be made are
jurisdictional amendments and are outside the time for perfecting of appeal. See Riewe,
13 S.W.3d at 413-14. Because our jurisdiction has not been invoked, we must dismiss the
appeals for lack of jurisdiction. See Slaton, 981 S.W.2d at 210.

 Accordingly, we dismiss the appeals for lack of jurisdiction.

 



 Phil Johnson

 Justice



Do not publish. 

 
1. Further references to the Texas Rules of Appellate Procedure will be by reference
to "TRAP_."



rable findings on both the traditional premises defect elements and the right to control. 

 Yet, the court also acknowledged that the need to illustrate the right to control is not
applicable in every situation wherein an independent contractor creates a hazardous
condition. For instance, when the conditions exist on the premises at the time the invitee
enters or were created by someone or something unrelated to the activity of the injured
invitee or his employer, the right to control is irrelevant. (6) Id. at 527-28. Then, the general
contractor or the one occupying the land must inspect the premises and warn invitees of
dangerous conditions of which it knows or should have known. Id. at 527; Shell Chemical
Co. v. Lamb, 493 S.W.2d 742, 746 (Tex. 1973); Bryant v. Gulf Oil Corp. 694 S.W.2d 443,
445-46 (Tex. App.--Amarillo 1985, writ ref'd n.r.e). And, though an opinion cited by Koko
insinuates otherwise, Amara v. Lain, 725 S.W.2d 734 (Tex. App.--Fort Worth 1986, no
writ), we believe it wrongly decided for several reasons.

 First, Amara does not comport with Clayton or Shell. Again, through the two latter
opinions, the Supreme Court held that the general duty owed by an owner/occupier to an
invitee applies when the injured did not create the condition or work for the entity which
did. Since the injured children in Amara were clearly not employees of the independent
contractor the test described in the foregoing sentence and mandated by the Texas
Supreme Court should have applied. Yet, the Amara panel utilized another; that is, it
utilized the one applicable when the injured either created the condition or worked for the
entity that did. In short, it followed the wrong rule. Second, the decision fails to comport
with §422 of the Restatement (Second) of Torts. There, we are told that:

 [a] possessor of land who entrusts to an independent contractor
construction, repair, or other work on the land, or on a building or other
structure upon it, is subject to the same liability as though he had retained
the work in his own hands to others on or outside of the land for physical
harm caused to them by the unsafe condition of the structure (a) while the
possessor has retained possession of the land during the progress of the
work, or (b) after he has resumed possession of the land upon its
completion.


Restatement (Second) Of Torts §422 (1965) (emphasis added). In other words, an
owner/occupier of land has no duty to insure that an independent contractor performs its
work safely. Koch Refining Co. v. Chapa, 11 S.W.3d 153, 155 (Tex. 1999). Yet, §422
illustrates that the owner/occupier cannot turn a blind eye to hazardous conditions created
by the independent contractor when it (the owner/occupier) retains control of the property
and continues to welcome invitees (who did not create or work for one who created the
condition) onto its premises. If this were not so, then the ramifications would be eye-opening. For instance, assume an independent contractor dug a large hole in front of a
hotel room as per the work order of the innkeeper and that the innkeeper knew the
contractor covered the hole with a thin tarp. Next, the unsuspecting guest while exiting his
room stepped on the tarp, which gave way, and fell into the hole. According to the court
in Amara, the innkeeper, who exercised no control over the work done by the independent
contractor would escape liability simply because an independent contractor dug the hole. 
Nothing in Clayton or its predecessors or progeny reasonably supports such a result,
though that is what Amara would permit. And, until the Supreme Court holds otherwise,
we opt not to abide by a rule inconsistent with Supreme Court guidance or dictate. 


 At bar, no one argues that Mayo was an employee of Mendoza or that his presence
at the hotel was somehow related to the activity being conducted by Mendoza. Similarly
undisputed is that Mayo's actions did not create the condition which resulted in his fall. 
This being true, the duties discussed in Clayton and Shell and involving hazardous
conditions made by individuals or entities other than the injured party or his employer are
applicable here. Thus, Koko's right to control Mendoza's activities was irrelevant, and the
trial court did not err when it omitted such an issue from its jury charge.

Issues Two and Six-- Insufficiency of the Evidence Proving Actual or 
Constructive Knowledge


 Through issues two and six, Koko argues that reversal is warranted because no
evidence or factually insufficient evidence supports the finding that it had actual or
constructive knowledge of the debris on which Mayo slipped. We overrule the issues.

 1. Standard of Review and Applicable Law

 The standards of review used in determining whether the evidence is legally and
factually sufficient to support a verdict are thoroughly discussed in Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965) and In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951), respectively. No further explanation of the standards is needed.

 Next, to recover upon a cause of action sounding in premises liability, the plaintiff
must establish (among other things) that the owner/occupier of the grounds had actual or
constructive knowledge of the condition that caused the injury. Wal-Mart Stores, Inc. v.
Reece, 81 S.W.3d 812, 814 (Tex. 2002). One may prove this element by showing that the
defendant created the condition or actually knew of it or that it existed long enough to give 
the premises owner a reasonable opportunity to discover it. Id. 

 2. Application of Standard and Law

 At bar, Mayo testified that Mendoza's trailer was filled with "rubble," "a big pile of . . .
[it lay] against the wall" of the building, "rubble [was] everywhere," and "behind the trailer
was a huge pile of rubble." The debris against the building appeared to be "stuff they
couldn't fit in this" trailer, he also opined. Furthermore, upon his falling, injuring himself,
and being assisted by others into the lobby of the motel, the desk clerk "came over" and
asked what had happened. After Mayo explained the incident, the clerk said, ". . . I'm
really sorry, I hope we can get maintenance to clean that up, we've told them about it" and
"we've been meaning to clean it up." The clerk also knew that "the work was going on
outside and . . . it was messy" because "she had already told [him] that." Viewing this
testimony and the reasonable inferences therefrom in a light most favorable to the verdict,
as we must, Raw Hide Oil & Gas, 766 S.W.2d at 276, it constitutes much more than a
scintilla of evidence upon which a reasonable factfinder could conclude that Koko actually
knew of the condition that caused Mayo to slip and fall long enough to direct maintenance
to clean it. Moreover, the finding is neither manifestly unjust or against the great weight
and preponderance of the evidence.

 To the extent that Koko believes the clerk's statements are no evidence of
knowledge because they can equally be construed as illustrating that maintenance was
contacted after Mayo fell, it is mistaken. It is true that circumstantial evidence from which
equally plausible but opposite inferences may be drawn is too speculative to support a
verdict. Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex. 1998). Yet, here,
the evidence in question does not support the inference Koko suggests it does. What is
missing from the record is any indication that the clerk left Mayo to call maintenance after
he told her what occurred and then returned to tell him that maintenance had been
contacted. The existence of such evidence would be necessary before anyone could
reasonably say that the clerk was referring to a post-incident call to maintenance. Instead,
what we have here is evidence of Mayo falling and then being helped into the lobby, the
clerk leaving her station at the front desk to approach and ask him what happened, and
then making the statements she did upon hearing his recitation of the events. Nowhere
is there any indication that the clerk knew of the accident before she approached Mayo or
interrupted her conversation with him to order others to remove the debris. 

Issue Three -- Mistrial


 Under its third issue, Koko asserts that the trial court erred in denying its motion for
mistrial. It was allegedly entitled to same because Mayo had interjected the issue of
control into the trial via his negligent activity theory, non-suited that claim, and nonetheless
continued to present evidence of control. This purportedly caused the "dynamics of the
case" to change, permitted the admission of "plainly irrelevant and inadmissible [evidence
of] remedial measures" and constituted "unfairness." We overrule the issue for several
reasons.

 First, in presenting evidence of control, Mayo did nothing more than that which Koko
argued he had to do, i.e. illustrate that Koko had the right to control Mendoza's activities. 
We cannot fault a plaintiff for attempting to prove what a defendant mistakenly claims to
be an element of the case.

 Second, irrespective of what Koko may say, control remained an issue in the case
even though the negligent activity theory was non-suited. The control of which we speak
was not that involving the regulation of Mendoza's activities but rather Koko's control of
the premises. If Koko lacked same then there would have been no foundation upon which
to base recovery upon the claim sounding in premises defect. This is so because a
landowner is not responsible for injuries arising from conditions created by an independent
contractor on property over which the landowner relinquished possession or control. See
Restatement (Second) Of Torts §422 (1965); Brownsville & Matamoros Bridge Co. v.
Null, 578 S.W.2d 774, 782 (Tex. Civ. App.--Corpus Christi 1978, writ ref'd n.r.e.).
Moreover, evidence of subsequent remedial measures undertaken by the owner can be
admitted to establish control over or the right to control the property. See Tex. R. Evid. 407
(stating that evidence of subsequent remedial measures may be admissible to prove
control).

Issue Four -- Admission of Expert Testimony 


 Koko next argues that the trial court erred in failing to exclude the expert testimony
of Dr. Gary Kronrad. Mayo retained Kronrad to render an opinion about Mayo's earning
capacity, past and future. The report subsequently developed (a copy of which Koko
received through discovery) and calculated Mayo's earning capacity based upon the
supposition that Mayo would have been making $6000 to $8000 per week as a motion
control expert. These calculations were tendered at trial. However, Mayo also had his
expert calculate what his earning capacity would have been had he remained a rigger. 
The latter opinion had not been previously disclosed to Koko, though Koko had sought
through discovery disclosure of the expert's opinions. Nor had Mayo previously disclosed
the factual data upon which Kronrad based his new opinion, though the identity of the
witness who actually supplied the data (i.e. Frank Stedtler) and the subject upon which
Stedtler proposed to testify had been disclosed. (7) Moreover, by the time Kronrad was
asked to discuss his new calculations, Stedtler had already testified, without objection,
about what Mayo could have expected to earn as a rigger. Nevertheless, Koko objected
to admission of the new calculations because they were not previously revealed via
supplementation to discovery. The trial court overruled the objection. We overrule the
issue.

 1. Standard of Review and Applicable Law

 Whether the trial court erred in allowing Kronrad to testify about the new
calculations depends upon whether it abused its discretion. National Liability and Fire Ins.
Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). Whether it abused its discretion depends
upon whether the decision failed to comport with controlling rules and principles or evinced
capriciousness or arbitrariness. Pack v. Crossroads, Inc., 53 S.W.3d 492, 499 (Tex. App.
--Fort Worth 2001, pet. denied). And, finally, whether abused discretion warrants reversal
depends upon whether it "probably caused the rendition of an improper judgment" or
"probably prevented the appellant from properly presenting the case to the court of
appeals." Tex. R. App. P. 44.1(a)(1) & (2). 

 Next, a party's duty to amend or supplement written discovery regarding a testifying
expert is governed by Texas Rule of Civil Procedure 193.5. Tex. R. Civ. P. 195.6. Per
Rule 193.5, the duty to supplement or amend arises when a party learns that its previous
responses to written discovery were incomplete or incorrect when made or no longer
complete or correct. Tex. R. Civ. P. 193.5(a). In addition to the requirements imposed by
Rule 193.5, a party must also amend or supplement any deposition testimony or written
report of an expert that it retained, employed, or controlled. Yet, the duty extends only to
the expert's mental impressions or opinions and the basis for them. Tex. R. Civ. P. 195.6. 
Moreover, caution must be taken in applying Rules 193.5(a) and 195.6 for neither prevents
an expert from refining his calculations and perfecting his report through time of trial. 
Exxon Corp. v. West Texas Gathering Co., 868 S.W.2d 299, 304 (Tex. 1993); Foust v.
Estate of Walters, 21 S.W.3d 495, 504 (Tex. App.--San Antonio 2000, pet. denied). For
instance, in Branham v. Brown, 925 S.W.2d 365 (Tex. App.--Houston [1st Dist.] 1996, no
writ), the expert based his prior findings upon a diagram that was not drawn to scale. 
When he received diagrams that were drawn to scale, he recalculated his findings using
settled principles of math. This merely constituted a refinement of those prior findings
which did not trigger the duty to supplement, according to the court. Id. at 370. Nor was
supplementation required in Lubbock County v. Strube, 953 S.W.2d 847 (Tex.
App.--Austin 1997, pet. denied), when the expert made additional calculations
immediately before trial regarding the plaintiff's damages. Though the percentage of
diminished earning capacity factored into the equation by the expert increased, the
methodology or formula he used to derive the sums did not. And, because it did not, the
appellate court held that Lubbock County had the requisite information it needed to "attack
[the expert's] testimony . . . whatever the level of diminished earning capacity." Id. at 856. 
So, there was no "fundamental alterations that would constitute a surprise attack" and
necessitate supplementation. Id.; see West Texas Gathering Co., 868 S.W.2d at 304
(stating that the duty to supplement requires that opposing parties have sufficient
information about an expert's opinion to prepare a rebuttal with their own experts). 

 Similarly, in Navistar Intern. Transp. Corp. v. Crim Truck & Tractor Co., 883 S.W.2d
687 (Tex. App.--Texarkana 1994, writ denied) the reviewing court refused to hold that the
new opinions of Navistar's expert had to be excluded. This was so because the new
opinions did not constitute a "material change in [the expert's] testimony" but rather
evinced "an expansion on an already disclosed subject." Id. at 691. That is, the expert
merely wanted to "put 'hard numbers' to his criticisms [of the opposing expert's opinions]
and illustrate for the jury the difference this would make to [Crim Tractor's] damages." Id.
at 690. Nor could the expert of Crim Tractor be prevented from changing his calculations
at trial by "subtracting numbers that Navistar argued should not have been included in the
first place." Id. at 692. Again, his new opinions were merely an expansion on topics
previously discussed.

 2. Application of Standard and Law

 At bar, and much like the expert in Navistar, Kronrad was simply applying different
data appearing of record into old methodology or formulas to voice an alternate opinion. 
That Koko had prior knowledge of the formulas or methodology being used is undisputed. 
Similarly beyond question is that Stedtler provided the trial court and jury with the new data
without objection from Koko. Under these circumstances, and again much like the expert
in Navistar, Kronrad merely functioned as a human calculator deriving sums from
information already before the jury. 

 A litigant can hardly claim surprise when his opponent removes a calculator from
his briefcase, inputs into it data already appearing of record, triggers the application of
settled mathematical formulas to that data by pressing a button, obtains a result, and then
presents the result to the jury. That is no less true when the calculator is a human being
applying known mathematical formulas. In the latter situation, the expert is not materially
changing his previous opinions but rather expanding on a subject already broached via
discovery and the presentation of evidence through other witnesses. In short, Kronrad
merely performed mathematical computations like the expert in Branham, and allowing him
to do so at trial was not an abuse of discretion. (8)

Issue Five -- Past and Future Earning Capacity


 Next, Koko questions the legal and factual sufficiency of the evidence underlying
the jury's awards for impairment to Mayo's past and future earning capacity. Simply said,
he believes that the awards were not supported by the evidence. We overrule the issue.

 1. Standard of review and applicable law

 The standards of review used in determining whether the evidence is legally and
factually sufficient to support a verdict are thoroughly discussed in Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965) and In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951), respectively. No further explanation of the standards is needed.

 Next, lost wages or earnings refers to the actual loss of income due to an inability
to perform a specific job from the time of injury to the time of trial. Strauss v. Continental
Airlines, Inc., 67 S.W.3d 428, 435 (Tex. App.--Houston [14th Dist.] 2002, no pet.); Border
Apparel-East, Inc. v. Guadian, 868 S.W.2d 894, 897 (Tex. App.--El Paso 1993, no writ). 
 On the other hand, lost earning capacity concerns the impairment to one's ability to work. 
 Guadian, 868 S.W.2d at 897. It entails the consideration of what the plaintiff's capacity
to earn a livelihood actually was and assesses the extent to which it was impaired. Id. 
Moreover, courts recognize that calculating the extent of impairment constitutes an
exercise in uncertainty. McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712 (1943). So,
much is left to the sound discretion of the jury. Id. This does not mean that it may simply
journey into the realm of conjecture. Quite the contrary, its decision must be based upon
such facts as are available in the particular case. Id.; Strauss, 67 S.W.2d at 436. The
"damages [must also be] proved with that degree of certainty of which the case is
susceptible." McIver, 169 S.W.2d at 712. And, "where the plaintiff seeks special damages
for loss of his earning capacity in a particular business or profession, the amount of his
earnings or the value of his services in that business must be shown with reasonable
certainty." Id. 

 Next, the non-exclusive factors to be considered include the earnings of the injured
party before and after the incident. Id. His stamina and ability to work with pain and the
weakness and degenerative changes which naturally result from the injury and from long
suffered pain also merit consideration. Guadian, 868 S.W.2d at 897 (citing Springer v.
Baggs, 500 S.W.2d 541 (Tex. Civ. App.--Texarkana 1973, writ ref'd n.r.e.)). So too does
logic compel that the potential of the individual, or his ability to advance in skill, job, and
pay, is also relevant, assuming that the potential can be reasonably extrapolated from the
evidence of the particular case. 

 2. Application of Standard and Law

 Appearing of record is evidence that Mayo was quickly progressing in the field of
concert rigging. Though not yet the head rigger at the time of his accident, one witness
(Stedtler) who had employed him before the accident testified that he would have hired
Mayo in that capacity for several particular concerts had he not suffered his foot injury. 
Furthermore, pay for that position approximated $3750 per week. 

 Next, Mayo's foot injury was not only painful, according to his testimony, but it also
prohibited him from climbing. The latter was essential to being a rigger. And, though
Mayo was capable of performing other jobs like carpentry and lighting, they paid less than
the sums earned by riggers. Furthermore, to the extent those other jobs required standing
for long periods of time, Mayo's injury, along with the accompanying arthritis, disabled him
from doing that.

 Also appearing of record is evidence illustrating that prior to his injury Mayo earned
from $1500 to $2500 per week as a rigger, depending upon the concert. For instance,
while on tour with Night Ranger, Bad Company and Ted Nugent, he received $1500 to
$2000 per week. With the Grateful Dead, he earned up to $2500 per week. Those
promoting Barbara Streisand's tour paid him $2400 to $2500 per week, and those
promoting Phil Collins and Genesis paid him $2000 to $2250. These tours could last up
to ten months, like that with Barbara Streisand. Furthermore, he would do "one off" shows
that paid from $200 to $400 per day. Yet, after suffering his injury and realizing he could
no longer be a rigger or pursue the status of head rigger, he took jobs as a carpenter
during the tours of the Dixie Chicks, Barry White, and Metallica and lighting technician
during the tours of Chicago and Bush. And, though he received $2000 per week when
working as the head carpenter with the Dixie Chicks (a job he can no longer perform given
the foot pain caused by standing), he was paid only $750 to $1100 by those promoting the
Chicago and Bush concerts. 

 Next, Kronrad, the expert retained to calculate lost earning and earning capacity,
opined that Mayo's lost earning capacity prior to trial approximated $270,000. This sum
consisted of a $6600 loss in 1995, $27,000 in 1996, $93,000 in 1997, $27,000 in 1998,
$36,000 in 1999, and $78,000 in 2000. Moreover, the sums for 1995 through 1999
represented the difference between what he was making before the injury while earning 
 $2000 per week as a rigger and what he made after it as a carpenter and lighting
technician. (9) The year 2000 calculation was based upon what he made before at $2000
per week as a number two rigger and what he could have made as a head rigger at $3750
per week had he not been injured. (10) 

 As to the impairment of future earning capacity, Kronrad compared the difference
between what Mayo was making in the jobs he had been doing with the pay he could have
made as a head rigger, i.e., $3750 per week. Furthermore, the difference was then
multiplied by 45, the latter representing the number of weeks Stedtler said Mayo could
reasonably expect to work per year in that capacity. The sum derived was then multiplied
by Mayo's life work expectancy (27 assuming retirement at 60 and 32 assuming retirement
at 65). That sum was then reduced to present value. The loss derived if retirement
occurred at 60 was $1,763,258 and at 65 was $2,018,780. 

 Finally, the jury awarded Mayo $270,000 in lost earning capacity in the past and
$1,200,000 for impairment to his future earning capacity. Comparison of each sum to the
calculations of Kronrad illustrates that the awards do not exceed the range of loss
described by the expert witness. Indeed, regarding future earning capacity, the jury found
the loss to be from $500,000 to $800,000 less than what Kronrad calculated. And,
because Kronrad's numbers were derived from evidence appearing of record, we cannot
say that the jury awards enjoy no evidentiary support. Nor can we say that the awards
were manifestly unjust or against the great weight and preponderance of the evidence.

 Having overruled all issues or points of error, we affirm the judgment of the trial
court.

 

 Brian Quinn

 Justice



Publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't
Code Ann. §75.002(a)(1) (Vernon Supp. 2002). 
2. A rigger is one who designs and operates systems for moving scenery, props, and staging for
concerts and shows.
3. Needless to say, the record is somewhat unclear given that Mayo was apparently pointing to
pictures as he described his injury and the litigants did not clarify for the record to what he was pointing.
4. We note that the issue before us does not involve the assignment of liability under circumstances
wherein the land owner relinquished control over the premises or parts thereof to an independent contractor. 
Nor does Koko suggest that it lacked the right to control the premises themselves, including the area on
which Mendoza worked and piled the material he excavated. Thus, the issue before us is whether 1) a motel
owner/operator can invite motel guests to enter the establishment, 2) then escape liability when one of those
guests is injured by a condition of which the owner/operator knows, 3) but which an independent contractor
retained by the motel owner/operator created. In effect, we must answer whether the right to control the
premises alone imposes liability when the known defect was created by neither the injured business invitee
or those for whom he worked. Or, may a motel owner do nothing to protect those renting rooms from
hazardous conditions simply because third parties hired by the motel but over whom the motel owner had
no control created them?
5. According to the court, a "general contractor in control of the premises is charged with the same
duty as an owner or occupier." Clayton, 952 S.W.2d at 527. Thus, the duties applicable to both are
synonymous in that both must use reasonable care to make and keep the premises safe for business
invitees. Id. 
6. This is so because general contractors or those occupying the premises have no duty to warn an
independent contractor of conditions caused by that contractor or its employees. Pence Constr. Corp. v.
Watson, 470 S.W.2d 637, 638-39 (Tex. 1971). The subcontractor is deemed to know of the condition
created by its employee, and the general contractor is not obligated to inform it of what it already knows. 
Id. Furthermore, the duty lies with the independent contractor to then inform its employees of the condition. 
Id. (citing Delhi-Taylor Oil Corp. v. Henry, 416 S.W.2d 390 (Tex. 1967)); Bryant v. Gulf Oil Corp. 694 S.W.2d
443, 445-46 (Tex. App.--Amarillo 1985, writ ref'd n.r.e.) (holding that the duty to protect the employees of
an independent contractor is that of the independent contractor, not the owner/occupier of the land). This
allocation of duties indeed is instructive for another reason. It indicates that the rule in Clayton applicable
to situations wherein the right to control must exist is restricted to circumstances wherein an employee of
an independent contractor suffers injury from conditions caused by that contractor or its employees. Under
those circumstances, the general contractor has no duty to warn the independent contractor or its employees
since the independent contractor is deemed to know of the condition created by its employees and has the
duty to then warn its other employees. Pence Constr. Corp. v. Watson, supra. And, those were the
circumstances in Clayton; the thread protectors upon which Olivo fell were placed there by other employees
working for the same independent contractor, Diamond M. So, Clayton (the general contractor) had no duty
to warn Diamond M of what the latter was deemed in law to already know. And, more importantly, Diamond
M had the duty to warn and protect its employee Olivo. So, unless Clayton had the right to control the
activities of Diamond M or its employees at the time (which right carried with it the correlative duty to
exercise it), Clayton would be insulated from liability. 
7. Koko did not depose Stedtler prior to trial. Furthermore, Kronrad received the data from Stedtler
about ten days to two weeks before trial. 
8. Whether our determination would have remained the same had Koko objected to and succeeded
in excluding Stedtler's testimony is something about which we do not opine. Under that situation, the data
would not have already been before the trial court. 
9. Mayo testified that he was making, pre-injury, $100,000 per year. This amount consisted of income
earned while on tour within the United States (which income would be reflected in his U.S. tax returns) and
income earned outside the United States (which income would not be reflected on his U.S. tax return). Mayo
was a citizen of Great Britain at the time. 
10. Again, Stedtler testified that he would have hired Mayo as the head rigger for that concert and
others had he not suffered a foot injury.