Affirmed as Modified and Memorandum Opinion filed October 21, 2004









Affirmed as Modified and
Memorandum Opinion filed October 21, 2004.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-01141-CV

_______________

 

REPUBLIC PARKING SYSTEM OF TEXAS, INC.,

REPUBLIC PARKING SYSTEM, INC., AND JAMES BERRY,
Appellants

 

V.

 



MEDICAL TOWERS, LTD., Appellee

 



 

On Appeal from the 133rd District Court

Harris County, Texas



Trial
Court Cause No. 99‑51860

 



 

M E M O R A N D
U M   O P I N I O N








Medical Towers, Ltd. sued Republic Parking System of Texas,
Inc., Republic Parking System, Inc. (ARepublic@), James C. Berry, and Carlydia Berry
for breach of contract and breach of fiduciary duty in the management of the
parking garage at Medical Towers. 
Pursuant to the jury=s verdict, the trial court rendered judgment that Medical
Towers recover from Republic and James Berry damages for Republic=s breach.  Carlydia Berry was dismissed from the lawsuit
before submission to the jury.  Republic
appeals the judgment on the grounds that: (1) the evidence is legally and
factually insufficient to support the jury=s finding that Republic breached the
contract; (2) the trial court failed to properly apply the statute of
limitations; (3) the evidence is legally and factually insufficient to support
the jury=s finding of a relationship of trust
and confidence; (4) the evidence is legally insufficient to support the jury=s finding of damages; (5) the trial
court abused its discretion in admitting expert testimony; (6) the trial court
abused its discretion in admitting evidence of Medical Towers=s attorney=s fees; and (7) the trial court erred
in its award of prejudgment interest. 
The trial court=s judgment is affirmed as reformed.

Background

Republic Parking System managed a parking garage in a
building known as Medical Towers. 
Republic was responsible for collecting revenue from daily and monthly
parkers.  Republic would deduct its
management fee and expenses and turn over the remaining revenue to Medical
Towers.  On October 23, 1997, Medical
Towers terminated Republic and hired Allright Parking to manage the
garage.  As is typical in the industry,
most of the garage employees remained at the Medical Towers garage, including
its manager, Ray Porter.

As part of the transition, Allright placed one of its
facility managers in the garage to supervise the transition of management
companies.  The manager, Lonnie Chenier,
noticed that if Ray Porter opened the garage in the morning when Chenier or another
employee was present, revenue for that day would be significantly higher than
the days in which Porter opened the garage alone.  Chenier then assigned different managers to
open the garage with Porter to determine if the trend continued.  Chenier testified that every time Porter
opened the garage with supervision, more revenue was turned over to Medical
Towers.  Chenier also testified that
Porter regularly arrived at 4:30 or 5:00 in the morning where most managers did
not come in until approximately 7:30, when most parkers arrived.  Chenier also discovered that Porter was
filling out shift reports that were intended to be filled out by cashiers and
forging the cashiers= signatures to the reports.








Chenier reported his findings to Sally Cobb, the property
manager for Medical Towers, who began to conduct an independent
investigation.  Cobb also noticed the
daily spikes in revenue after Allright took over, and began to keep a daily
cash log.  Cobb also noticed that when
Porter worked alone, revenue went down. 
Cobb testified that the revenue spike was not due to an increase in
parking rates or in the number of cars parked each day.  Porter was terminated as garage manager.  After Porter was terminated, garage revenue
increased an average of $400 to $500 per day.

Clyde Wilson, Medical Towers=s parking garage expert, testified
that he conducted an audit of the garage. 
The audit revealed that total cash collected, total tickets pulled, and
the number of all day tickets spiked significantly after Porter was
terminated.  Wilson testified that he
reviewed cashier shift reports and composite reports, but did not have actual
tickets from the garage to review. 
Wilson testified that garage revenue does not ordinarily change
significantly without an outside reason. 
No marketing efforts or rate changes took effect at the time of the
spikes in revenue.  Further, the garage
had been used to capacity when Republic was the manager and when Allright
managed the garage.  Both companies used
valet parkers to double park cars so that more cars could be parked each
day.  Although he could not determine
exactly what happened, Wilson speculated that Porter would arrive very early in
the morning and turn the ticket spitter off so cars could enter without a
ticket.  When a car left the garage
without a ticket, the cashier would charge the driver for parking, but there
would be no proof of payment.  Porter
would then fill out the cashiers= shift reports and, in this manner,
Wilson concluded that Porter was able to steal approximately $400 to $500 per
day.  Wilson further testified that
Medical Towers suffered approximately $700,000 in damages as a result of Porter=s theft.








Herbert Lyon, an economics professor at the University of
Houston, testified about damages suffered by Medical Towers.  Lyon analyzed parking fees collected by
Republic and those collected by Allright. 
He testified that after Allright took over there were no changes in
operating hours, parking rates, or parking validations.  Although an adjacent garage had construction
work performed, which could affect parking at Medical Towers, that construction
was completed over the weekend when neither garage is used to its full
capacity. Lyon calculated that Allright collected between sixteen and eighteen
percent more income than Republic under identical conditions.  Lyon testified that if Republic had been
collecting full parking fees while it managed the garage, it would have
collected between $310,589 and $337,600 more than it turned over to Medical
Towers.

Medical Towers sued Republic for breach of contract and
breach of fiduciary duty.  The jury found
Republic failed to comply with the Parking Management Agreement and Medical
Towers suffered $300,063 in damages as a result of that breach.  The jury further found that Republic did not
comply with its fiduciary duty to Medical Towers and found damages in the same
amount.  The Aone
satisfaction rule@
prohibits a plaintiff from recovering twice for a single injury.  Crown Life Ins. v. Casteel, 22 S.W.3d
378, 390B91 (Tex.
2000).  Therefore, the trial court awarded judgment on the
jury=s verdict and based its damage award
on either the jury=s finding of breach of fiduciary duty or breach of contract.

Admission of Expert Testimony








In its sixth issue, Republic contends the trial court abused
its discretion by permitting introduction of evidence through Medical Towers=s expert, Clyde Wilson.  Prior to trial, Republic objected to the use
of Clyde Wilson as a parking garage expert because his testimony was not
reliable.  Specifically, Republic
contends Wilson did not review the actual parking tickets for the garage, so
his methodology is not reliable.  We
review challenges to the admission of expert testimony under an abuse of
discretion standard.  Daubert v.
Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589B90, 113 S.Ct. 2786, 2795, 125 L.Ed.2d
469 (1993); E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 558 (Tex. 1995).  The
testimony of a qualified expert is generally admissible when scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact issue.  Tex.
R. Evid. 702.  The trial court has
the gatekeeper function of ensuring that expert testimony is based on a
reliable foundation and is relevant to the issues in the case.  Gammill v. Jack Williams Chevrolet, Inc.,
972 S.W.2d 713, 728 (Tex. 1998).  Once
the party opposing the expert testimony specifically objects, the proponent
bears the burden of demonstrating admissibility.  Robinson, 923 S.W.2d at 557.  

In ensuring that the testimony rests on a reliable
foundation, the trial court is not to determine whether an expert=s conclusions are correct, but only
whether the analysis used to reach those conclusions is reliable considering
all the evidence.  Gammill, 972
S.W.2d at 728.  In Robinson, the
Texas Supreme Court set forth six factors, now known as the Daubert/Robinson
factors, to aid courts in determining whether scientific testimony is reliable:
(1) the extent to which the theory has been tested; (2) the extent to which the
technique relies on the expert=s subjective interpretation; (3) whether the theory has been
subject to peer review and/or publication; (4) the technique=s potential rate of error; (5) whether
the underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and (6) the nonjudicial uses that have been made
of the theory or technique.  Robinson,
923 S.W.2d at 557; see also Gammill, 972 S.W.2d at 720B21.








Following Robinson, the Texas Supreme Court addressed
the issue of scientific and nonscientific evidence and determined that while
all expert testimony must be reliable before it may be admitted, the factors
affecting reliability as outlined in Robinson do not apply to all expert
testimony.  Gammill, 972 S.W.2d at
726.  Instead, where experts rely on
experience and training rather than a particular methodology to reach their
conclusions, the trial court must determine whether there may be Asimply too great an analytical gap
between the data and the opinion proffered@ for the opinion to be reliable.  Id.; Taylor v. Fabritech, Inc.,
132 S.W.3d 613, 619 (Tex. App.CHouston [14th Dist.] 2004, pet. ref=d). 
In discharging its duty as gatekeeper, the trial court is in the best
position to decide whether the Gammill general reliability test should
be applied to determine the reliability of the expert=s testimony.  Gammill, 972 S.W.2d at 726; see
Couch v. Simmons, 108 S.W.3d 338, 342B43 (Tex. App.CAmarillo 2003, no pet.).

At a pretrial hearing on Republic=s motion to exclude, Wilson described
his background as a partner in a company known as The Parking Network, which
serves as a consulting company to the parking industry.  A large portion of Wilson=s business is auditing the parking
industry.  Wilson has worked as a parking
consultant for twenty-three years and made three or four presentations to the
National Parking Association on audit procedures.  Wilson testified that when money is missing
from a parking garage, if records are not computerized, he looks for revenue
trend changes and ticket trend changes, and familiarizes himself with the
facility.  For this case, Wilson reviewed
all composite reports from 1984 through the end of 1998 with a gap between 1986
and May, 1990.  The gap occurred because
Republic did not have documentation from that time period.  The composite reports contained information
on all tickets collected throughout the day. 
Wilson testified that generally, if someone is stealing from a parking
garage, he will take money when no ticket has been issued.  This is why review of the trends is
necessary.  Wilson testified that
actually reviewing the tickets would not have aided him in his audit because
when someone is stealing, there are no tickets. 
Wilson considered several factors in his audit including frequency of
building occupancy, the possibility of an increase in daily parkers versus contract
parkers, parking validation, marketing, and higher parking rates.  Wilson also reviewed occupancy of the
surrounding facilities to determine if the increase in parking fees could be
due to another nearby facility being closed. 








On cross-examination, Wilson stated he was not an accountant
and he had not spoken with Ray Porter[1]
or Jim Berry, Republic=s chairman.  Wilson did
not have his peers in the industry review his report, nor did he publish the
report.  Wilson also admitted that during
his deposition he said he could not perform an audit pursuant to Generally
Accepted Accounting Principles without the original tickets from the garage.  Wilson testified, however, that Republic did
not provide him with the tickets because they had been destroyed.  His audit of the parking garage was based on
reports of daily garage activity.  Wilson=s experience, coupled with his
thorough testimony about the methodology he employed, demonstrate the opinions
he drew from the underlying data are reliable. 
See Gammill, 972 S.W.2d at 726. 
The trial court did not abuse its discretion in admitting Wilson=s testimony.  Republic=s sixth issue is overruled.

Sufficiency of the Evidence

In its first, second, and fifth issues, Republic contends the
evidence is legally and factually insufficient to support the jury=s finding of breach of contract and
damages.

Standard of Review

When a party challenges legal sufficiency of the evidence
supporting an adverse finding relative to an issue on which it does not have
the burden of proof, it must demonstrate on appeal that there is no evidence to
support the adverse finding.  Croucher
v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Price Pfister, Inc. v. Moore
& Kimmey, Inc., 48 S.W.3d 341, 347 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  We consider all the evidence in
the light most favorable to the jury=s verdict, indulging every reasonable
inference in favor of the prevailing party. 
Price Pfister, 48 S.W.3d at 347. Only the evidence and inferences
supporting the finding are considered, and we must disregard all evidence and
inferences contrary to the jury=s finding.  Lenz v.
Lenz, 79 S.W.3d 10, 19 (Tex. 2002).  








If any finding is challenged for factual sufficiency of the
evidence, all the evidence in the record is reviewed.  See Plas‑Tex, Inc. v. U.S. Steel
Corp., 772 S.W.2d 442, 445 (Tex. 1989); Delaney v. Davis, 81 S.W.3d
445, 448 (Tex. App.CHouston [14th Dist.] 2002, no pet.).  The jury as trier of fact is the sole judge
of the credibility of the witnesses and the weight to be given to their
testimony.  Mayes v. Stewart, 11
S.W.3d 440, 451 (Tex. App.CHouston [14th Dist.] 2000, pet. denied).  We may not substitute our judgment for that
of the trier of fact, even if we would reach a different answer on the
evidence.  See Maritime Overseas Corp.
v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).

Breach of Contract

In its first issue, Republic contends the evidence is legally
and factually insufficient to support the jury=s finding that Republic failed to
comply with the written contract.  In its
second issue, Republic contends the jury=s finding that Republic failed to
comply with the contract is against the great weight and preponderance of the
evidence.

The Parking Management Agreement required Republic to Acollect, or cause to be collected,
all of the gross receipts from the operation and use of the Garage.@ 
Evidence at trial showed that revenue increased approximately $400 to
$500 per day when Allright took over management of the garage and began to
supervise Ray Porter.  Wilson and Lyon
testified that such a revenue spike is unusual in the parking business and is
due to a factor other than mere change of management company.  Wilson and Lyon testified that no other
factors, such as operating hours or rate changes, could have caused the spike
in revenue.  Chenier and Cobb testified
that revenue was higher when Porter was supervised.  Medical Towers presented evidence through two
experts that revenue increased significantly after Porter was terminated and
remained steady at the higher rate. 
Further, Medical Towers presented evidence that Porter forged signatures
on cashiers= reports and came into the garage
while on vacation to open the garage and fill out reports.  Reviewing the evidence in the light most
favorable to the jury=s verdict, we find sufficient evidence that Republic did not
turn over all gross receipts from the parking garage to Medical Towers and
therefore failed to comply with the contract. 
Republic=s first issue is overruled.








Republic presented evidence through its expert, Ed Urrutia, that
Wilson=s audit of the parking garage was not
accurate because he did not review the actual tickets taken by the garage
operator each day.  Wilson, however,
testified that because Porter was most likely turning off the ticket spitter
every morning, an audit of the tickets collected would not show any
wrong-doing.  Urrutia further testified
that a revenue spike could have occurred because the parking gates were used
earlier in the morning and later in the evening when Allright took over
management.  There was no evidence
presented, however, that the gates were used at different times after Allright
took over.  Reviewing all of the
evidence, in favor of and against the verdict, we hold the jury=s finding that Republic did not
comply with the contract is not against the great weight and preponderance of
the evidence.  Republic=s second issue is overruled.

Damages

In its fifth issue, Republic contends the damages are not
based on legally sufficient evidence. 
Republic contends that without proof of gross revenue and without proof
of contractually defined expenses, Medical Towers failed to establish either
the fact that profits were lost or the amount of any net profits.  To recover lost profits, the loss amount must
be shown by competent evidence with reasonable certainty.  Szczepanik v. First S. Trust Co., 883
S.W.2d 648, 649 (Tex. 1994); Holt Atherton Indus., Inc. v. Heine, 835
S.W.2d 80, 84 (Tex. 1992).  Recovery for
lost profits does not require that the loss be susceptible to exact
calculation.  Texas Instruments, Inc.
v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994).  However, the injured party must do more than
show that it suffered some lost profits.  Id. 
The test is a flexible one in order to accommodate the myriad
circumstances in which claims from lost profits arise.  Teletron Energy Mgt., 877 S.W.2d at
279.  What constitutes reasonably certain
evidence of lost profits is a fact intensive determination.  Heine, 835 S.W.2d at 84.  At a minimum, opinions or lost profit
estimates must be based on objective facts, figures, or data from which the
lost profits amount may be ascertained.  Szczepanik,
883 S.W.2d at 649.








Herbert Lyon conducted an analysis of the parking garage
revenue each month from January 1990 through March 1999.  Lyon factored management fees and expenses
into the analysis to ensure the analysis included only parking revenue.  Lyon compared each month=s receipts while Republic managed the
garage with Porter as its manager to each month=s receipts when Allright managed the
garage after Porter was terminated.  Lyon
ensured that during the time period under analysis, there had been no change in
operating hours or in the occupancy of the building.  After adjustment for a fee increase in April
1998, Lyon determined that Republic collected sixteen to eighteen percent less
revenue than it should have under the contract. 
Using those percentages, Lyon determined that Medical Towers=s lost profits for the period of time
Republic managed the garage were between $310,589 and $337,600.  Republic did not object to the reliability of
Lyon=s testimony.  The jury found $300,063 in damages.  Reviewing the evidence in the light most
favorable to the verdict, we find Medical Towers=s evidence is legally sufficient to
show lost profits with reasonable certainty. 
Republic=s fifth issue is overruled.

Fiduciary Relationship

In its fourth issue, Republic contends there was no fiduciary
relationship between Republic and Medical Towers as a matter of law.  The jury found a relationship of trust and
confidence existed between Republic and Medical Towers.  There are two types of fiduciary relationships.  The first is a formal fiduciary relationship,
which arises as a matter of law, and includes the relationships between
attorney and client, principal and agent, partners, and joint venturers.  Insurance Co. of N. Am. v. Morris, 981
S.W.2d 667, 674 (Tex. 1998); Hoggett v. Brown, 971 S.W.2d 472, 487 (Tex.
App.CHouston [14th Dist.] 1997, pet.
denied).  The second is an informal
fiduciary relationship, which may arise from Aa moral, social, domestic or purely
personal relationship of trust and confidence, generally called a confidential
relationship.@ 
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276,
287 (Tex. 1998).








Formal Fiduciary Relationship

Medical Towers contends Republic owed fiduciary obligations
to Medical Towers because Republic was its agent for the collection of
money.  Medical Towers failed, however,
to submit an issue to the jury asking whether Republic was its agent.  Medical Towers, on appeal, contends that by
the very nature of the relationship, as defined by the contract, Republic is a
fiduciary because it was Medical Towers=s agent for purposes of collecting
the parking revenue.  

An agency is the consensual relationship between two parties
where one, the agent, acts on behalf of the other, the principal, and is
subject to the principal=s control.  Schultz
v. Rural/Metro Corp. of New Mexico-Texas, 956 S.W.2d 757, 760 (Tex. App.CHouston [14th Dist.] 1997, no
pet.).  An agency relationship will not
be presumed, and the party asserting the relationship has the burden to prove
its existence.  Burnside Air
Conditioning and Heating Inc. v. T.S. Young Corp., 113 S.W.3d 889, 896
(Tex. App.CDallas 2003, no pet.).  The Parking Management Agreement provides
that Republic Ashall serve only in the capacity of
an independent contractor.@  An independent
contractor is one who, in the pursuit of an independent business, undertakes a
specific job for another person, using his own means and methods, without
submitting himself to the other=s control regarding details of the job.  Ross v. Texas One Partnership, 796
S.W.2d 206, 210 (Tex. App.CDallas 1990), writ denied, 806 S.W.2d 222 (Tex.
1991).  

Medical Towers bore the burden to obtain affirmative answers
to jury questions as to the necessary elements of its cause of action.  Ramos v. Frito Lay, Inc., 784 S.W.2d
667, 668 (Tex. 1990). The failure to submit a question to the jury on whether
Republic was Medical Towers=s agent waived any such claim. See Southwestern Bell Tel.
Co. v. DeLanney, 809 S.W.2d 493, 495 (Tex. 1991).  Without a jury issue on agency, we conclude
there was no finding of a formal fiduciary relationship between the parties.








Informal Fiduciary Relationship

Medical
Towers further contends Republic owed fiduciary obligations to Medical Towers
because it collected Medical Towers=s money.  To impose an informal fiduciary duty in a
business transaction, the requisite special relationship of trust and
confidence must exist prior to, and apart from, the agreement made the basis of
the suit.  Schlumberger Tech.
Corp. v. Swanson, 959 S.W.2d 171, 177 (Tex. 1997).  Confidential relationships may arise when the
parties have dealt with each other in such a manner for a long period of time
that one party is justified in expecting the other to act in its best interest.  Morris, 981 S.W.2d at 674.  Fiduciary duties arise from the relationship
of the parties and not from a contract.  Manges
v. Guerra, 673 S.W.2d 180, 183 (Tex. 1984).

Medical
Towers contends Republic was its fiduciary because it held money for Medical
Towers=s benefit.  For this proposition, Medical Towers cites
several cases that hold, AOne is said to act in a fiduciary capacity or to receive
money or contract a debt in a fiduciary capacity when the business which he
transacts, or the money or property which he handles, is not his or for his own
benefit, but for the benefit of another person as to whom he stands in a
relation implying and necessitating great confidence and trust on the one part
and a high degree of good faith on the other part.@ 
Gonzalez v. State, 954 S.W.2d 98, 103 (Tex. App.CSan Antonio 1997, no pet.), quoting
Black=s Law
Dictionary 625 (6th ed.
1990).  See also Huett v. State,
970 S.W.2d 119, 124B25 (Tex. App.CDallas 1998, no pet.); Starnes v. State, 929 S.W.2d
135, 137B38 (Tex. App.CFort Worth 1996, no pet.).  Even under the cases cited by Medical Towers,
there must be proof of a relationship that implies and necessitates great
confidence and trust between the parties. 
The simple fact that Republic contracted to hold the parking garage
revenue for the benefit of Medical Towers is not enough to show the parties
were in a fiduciary relationship.








The fact that one businessman trusts another and relies on
another to perform a contract does not give rise to a confidential relationship
because something apart from the transaction between the parties is
required.  Crim Truck & Tractor
Co. v. Navistar Int=l Transp. Corp., 823 S.W.2d 591, 594 (Tex. 1992).  Subjective trust is not sufficient to
transform an arms-length transaction into a fiduciary relationship.  Schlumberger, 959 S.W.2d at 177.  There is no evidence in the record that
Republic and Medical Towers maintained a relationship of trust and confidence
prior to, and apart from, the contract made the basis of this suit.  The definition of fiduciary capacity found in
the cases cited by Medical Towers does not transform the business relationship
between the parties into a fiduciary one merely because Republic collected
parking fees for Medical Towers.  In a
business transaction, the trust and confidence must have occurred apart from
the business transaction.  Schlumberger,
959 S.W.2d at 177.  Because Republic owed
no fiduciary duty to Medical Towers, we sustain Republic=s fourth issue.  

Statute of Limitations

In its third issue, Republic contends Medical Towers=s claims are barred by limitations
for damages that accrued more than four years prior to the date of the
lawsuit.  Medical Towers asserted two
causes of action in its lawsuit: breach of contract and breach of fiduciary
duty.  Because we have determined that no
fiduciary duty was owed, we will address the statute of limitations for breach
of contract.  A breach of contract cause
of action accrues at the time of breach and must be brought within four years.  Stine v. Stewart, 80 S.W.3d 586, 592
(Tex. 2002); Tex. Civ. Prac. & Rem.
Code Ann. ' 16.004.  If a
continuing breach has occurred, a plaintiff is entitled to recover damages from
four years prior to the filing of its original petition.  See Dvorken v. Lone Star Industries, Inc.,
740 S.W.2d 565, 567 (Tex. App.CFort Worth 1987, no writ). 









Here, a breach of the contract occurred every time Republic
did not turn over all the revenue collected from the garage.  Suit was filed October 15, 1999.  Under the continuing breach theory, Medical
Towers is barred from recovering damages that accrued prior to October 15,
1995.  Two exceptions would allow Medical
Towers to recover for any breach prior to October 15, 1995: (1) the continuing
contract doctrine and (2) the discovery rule.

Continuing Contract

A continuing contract is one in which the contemplated
performance and payment are divided into several parts, where the work is
continuous and indivisible, and the payment is made in installments as the work
is completed.  Hubble v. Lone Star
Contracting Corp., 883 S.W.2d 379, 382 (Tex. App.CFort Worth 1994, writ denied).  If the parties= agreement contemplates a continuing
contract for performance, the limitations period does not usually commence
until the contract is fully performed.  Intermedics,
Inc. v. Grady, 683 S.W.2d 842, 845 (Tex. App.CHouston [1st Dist.] 1984, writ ref=d n.r.e.)  In such a continuing contract, where a claim
for work, labor, or materials furnished is based on an entire contract for
continuous work, labor, or materials, the claim is considered to be an entire
demand, and the limitations period will not commence until the contract is
finished.  Godde v. Wood, 509
S.W.2d 435, 441 (Tex. Civ. App.CCorpus Christi 1974, writ ref=d n.r.e.).  If the terms of an agreement, however, call
for periodic payments during the course of the contract, a cause of action for
such payments may arise at the end of each period, before the contract is
completed. Townewest Homeowners Assoc. Inc. v. Warner, 826 S.W.2d 638,
640 (Tex. App.CHouston [14th Dist.] 1992, no
writ).  

The Parking Management Agreement was not a continuing
contract.  The term of the contract was
for five years with one year automatic renewals thereafter.  The work contracted for was management of the
parking garage, which called for periodic payments of revenue to Medical
Towers.  Because a breach of contract
occurred each time Republic failed to turn over all of the revenue, the
continuing contract doctrine does not apply.








Discovery Rule

Medical Towers contends the discovery rule applies to toll
the statute of limitations.  The jury
determined that Medical Towers, in the exercise of reasonable diligence, did
not discover its injury until December 10, 1997.  The discovery rule exception defers accrual
of a cause of action until the plaintiff knew or, exercising reasonable
diligence, should have known of the facts giving rise to the cause of action.  KPMG Peat Marwick v. Harrison County Housing
Finance Corp., 988 S.W.2d 746, 749 (Tex. 1999).  The discovery rule is a limited exception to
a statute of limitations, and its use is condoned only when the nature of the
plaintiff=s injury is both inherently undiscoverable
and objectively verifiable.  Wagner
& Brown, Ltd. v. Horwood, 58 S.W.3d 732, 734 (Tex. 2001).  The requirement of inherent undiscoverability
recognizes that the discovery rule exception should be permitted only in
circumstances where it is difficult for the injured party to learn of the
negligent act or omission.  Computer
Associates International, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex.
1996).  An injury is inherently
undiscoverable if it is, by its nature, unlikely to be discovered within the
prescribed limitations period despite due diligence.  S.V. v. R.V., 933 S.W.2d 1, 7 (Tex.
1996). Accordingly, the question here is not whether Medical Towers discovered
that Republic breached the contract within the limitations period, but whether
such a breach is the type of injury that generally is discoverable by the
exercise of reasonable diligence.  See
HECI Exploration Co v. Neel, 982 S.W.2d 881, 886 (Tex. 1998).








The Parking Management Agreement provided Medical Towers with
a right to audit Republic=s operations at reasonable times and in reasonable
detail.  Medical Towers had some
obligation to exercise reasonable diligence in protecting its interests.  See id.  Such reasonable diligence would include
Medical Towers conducting an audit as permitted by the contract.  Medical Towers contends its injury was
inherently undiscoverable because it had no frame of reference by which to
judge the level of income because it was dependent on Porter=s information.  By merely being present when Porter was
present, however, a representative of Medical Towers could have discovered the
increased revenue on the days when Porter was supervised.  We find Medical Towers=s injury was not inherently
undiscoverable.  Therefore, it was error
for the trial court to submit an issue to the jury on the discovery rule.  The statute of limitations, therefore, bars
recovery of damages that occurred prior to October 15, 1995.  Republic=s third issue is sustained.  

Attorney=s Fees

In its seventh issue, Republic contends the trial court
abused its discretion by permitting introduction of evidence of Medical Towers=s attorney=s fees.  Prior to trial, Medical Towers disclosed that
its attorney=s fees experts believed a forty
percent contingent fee through trial and a forty-five percent contingent fee if
appealed were reasonable fees.  At trial,
Medical Towers=s attorney testified that she
contracted with Medical Towers for a forty percent contingent fee.  The attorney also testified that her
customary hourly rate was $300 per hour and she worked at least 1000 hours on
Medical Towers=s lawsuit.  Republic contends the trial court abused its
discretion by admitting evidence of the attorney=s hourly rate and number of hours
worked because that evidence went beyond the forty percent fee disclosed during
pretrial discovery.

Medical Towers is entitled to recover attorney=s fees under section 38.001 of the
Texas Civil Practice and Remedies Code, which provides that a person may
recover reasonable attorney=s fees in addition to the amount of a valid claim if the
claim is one of several specifically listed types, including an oral or written
contract.  The Texas Supreme Court has
held that evidence of a contingent fee agreement alone is insufficient to
support an award of attorney=s fees.  Arthur
Andersen v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997). To
determine the reasonableness of an attorney=s fee, the trial court should
consider the following factors: 

(1) the time and labor required;








(2) the likelihood that the acceptance of the
particular employment will preclude other employment by the lawyer; 

(3) the fee customarily charged in the locality for
similar legal services; 

(4) the amount involved and the results obtained; 

(5) the time limitations imposed by the client or by
the circumstances; 

(6) the nature and length of the professional relationship
with the client; 

(7) the experience, reputation, and ability of the
lawyer or lawyers performing the services; and 

(8) whether the fee is fixed or contingent on results
obtained or uncertainty of collection before the legal services have been
rendered. 

Id.

Disclosure of the above factors in response to Republic=s discovery was not required. An
expert may refine calculations or perfect a report up until the time of
trial.  Exxon Corp. v. West Tex.
Gathering Co., 868 S.W.2d 299, 304 (Tex. 1993).  An expert also may change an opinion without
supplementation if the opinion is an Aexpansion of an already disclosed
subject.@ 
Navistar Int=l Transp. Corp. v. Crim Truck & Tractor Co., 883 S.W.2d 687, 691 (Tex. App.CTexarkana 1994, writ denied).  The purpose of requiring timely disclosure of
a material change in an expert=s opinion is to give the other party an opportunity to
prepare a rebuttal.  Exxon Corp.,
868 S.W.2d at 304.  By testifying to the
factors required by the supreme court, Medical Towers=s attorney did not materially change
her opinion with regard to attorney=s fees.  Medical Towers requested attorney=s fees in its pleadings so Republic
was aware that Medical Towers would have to present evidence of those factors
and had sufficient time to prepare a rebuttal. 
The trial court did not abuse its discretion in admitting evidence of
Medical Towers=s attorney=s fees.  Republic=s seventh issue is overruled.

Prejudgment Interest








In its eighth issue, Republic contends the trial court erred
in its award of prejudgment interest.  In
a supplemental post-trial motion, Medical Towers inadvertently stated the
accrual date for prejudgment interest was October 15, 1998, one year before the
original petition was filed.  A claim for
prejudgment interest may have one of two bases: (1) general principles of
equity or (2) an enabling statute.  Cavnar
v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985).  Previously, a distinction was made between
those causes of action specifically mentioned in the Finance Code and those
arising under common law.  However, the
supreme court aligned the common law prejudgment interest accrual scheme with
the Finance Code in Johnson & Higgins, Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507, 531 (Tex. 1998).  Under
both the Finance Code and the common law, prejudgment interest begins to accrue
on the earlier of (1) 180 days after the date a defendant receives written
notice of a claim, or (2) the date the suit is filed.  Tex.
Fin. Code Ann. ' 304.104; Johnson & Higgins, 962 S.W.2d at 531.

Here, notice was sent by Medical Towers March 25, 1998, but
Republic did not receive notice until April 27, 1998.  Therefore, the appropriate accrual date for
prejudgment interest is 180 days after April 27, 1998, which would be October
24, 1998, nine days after the date reflected in Medical Towers=s motion.  Therefore, the trial court erred in its award
of prejudgment interest.  Republic=s eighth issue is sustained.

In Republic=s ninth issue, it contends the trial court erred by refusing
Republic=s post-judgment motions and in its
tenth issue, Republic contends the errors in the trial court, whether singly or
in combination, resulted in rendition of an improper judgment.  Issues nine and ten are repetitive of issues
one through eight.  Accordingly, Republic=s ninth and tenth issues are
overruled.

Conclusion








The judgment of the trial court is reformed to delete damages
for lost revenues and prejudgment interest prior to October 15, 1995.  Further, prejudgment interest awarded on
damages after October 15, 1995 is reduced by nine days.  In all other respects the judgment of the
trial court is affirmed.

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered
and Memorandum Opinion filed October 21, 2004.

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

 

 











[1]  Ray Porter
died before Wilson could contact him for the report.