NO. 07-01-0332-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

NOVEMBER 21, 2002

_____

KOKO MOTEL, INC.,

Appellant

v.

ARTHUR MAYO,

Appellee

_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 97-560,912; HON. SAM MEDINA, PRESIDING

_____

Before QUINN, AND JOHNSON, J.J., AND BOYD, SJ.[1]

Koko Motel, Inc. (Koko) appeals from a judgment awarding Arthur Mayo (Mayo) damages for personal injuries sustained on the premises of the motel. His injuries were caused by a condition which a plumber, Ramon Mendoza, created while fixing a sewer line in the motel lobby. Six issues are asserted as grounds justifying reversal of the judgment. Through them, Koko argues that 1) the trial court erred in failing to ask the jury (through the charge) whether Koko controlled the manner in which the plumber performed his

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2002).

duties, 2) the evidence is legally or factually insufficient to show that Koko had actual or constructive knowledge of the premises defect, 3) the trial court erred in denying Koko's motion for a mistrial after both parties introduced substantial evidence on the issue of control prior to Mayo non-suiting his action for negligent activity, 4) the trial court erred in admitting, over its objection, expert evidence that was not produced prior to trial, and, 5) the evidence is legally and factually insufficient to support the damages awarded for lost wages and earning capacity. We affirm the judgment.

## *Background*

Upon reading the record in a light most favorable to the judgment, *Raw Hide Oil & Gas v. Maxus Exploration,* 766 S.W.2d 264, 276 (Tex. App.—Amarillo 1988, writ denied) (requiring that we do so when questions about the legal sufficiency of the evidence are raised), we note the following. Koko retained Mendoza, an independent contractor, to repair a sewer line inside the motel lobby. Performance of the job entailed the removal of soil and debris, including pieces of concrete from the foundation, to gain access to the line. The hole he excavated in the concrete floor was three to four feet long. Underneath the floor, however, it was approximately 12 feet long and four feet deep. As the soil and debris were removed, Mendoza carried it in buckets to an unenclosed utility trailer parked on the sidewalk outside an entrance to the facility. He would empty the buckets onto the trailer, and then empty the trailer elsewhere once it was filled with debris. Mendoza admitted that debris would sometimes fall off the trailer onto the ground.

2

Mendoza had been performing the work for several days when Mayo (a rigger touring with the band Night Ranger) rented a room at the motel.[2] Upon returning to the lobby of the motel after speaking to associates in the parking lot, Mayo walked past Mendoza's trailer and slipped upon a piece of concrete laying on the ground. As he fell, his foot apparently struck the trailer, which resulted in the fracture of a metatarsal bone.[3] Mayo then noticed the concrete object on which he slipped, picked it up, and tossed it into the trailer with the other debris from Mendoza's work. After doing so, Mayo also noticed that the trailer was "slammed" with "rubble" and that a mound of it also lay against the wall of the motel.

Mayo subsequently entered the motel lobby with help from others and spoke with the receptionist on duty. When he told her of what happened, she stated that she was "really sorry" and that she "hope[d] we can get maintenance to clean that up, we've told them about it." No barriers or markers surrounded the trailer's site at the time, though Koko personnel did place some there at night so guests could see the area. And, that Mayo was a business invitee at the time he fell is undisputed.

Mayo sued Koko, alleging causes of action sounding in negligence and premises liability. Only the latter was submitted to the jury, however, for he non-suited the former once trial began. Eventually, the jury found Koko responsible for the incident and ensuing injury and awarded Mayo $5,000 for past physical pain and mental anguish, $25,000 for

---

[2]A rigger is one who designs and operates systems for moving scenery, props, and staging for concerts and shows.

[3]Needless to say, the record is somewhat unclear given that Mayo was apparently pointing to pictures as he described his injury and the litigants did not clarify for the record to what he was pointing.

future physical pain and mental anguish, $270,000 for loss of earning capacity in the past, $1,200,000 for loss of earning capacity in the future, $5,000 for disfigurement in the past, and $6,000 for medical care in the past. A judgment on that verdict was then entered by the trial court.

### Issue One — Instruction on the Matter of Control

In its first issue, Koko argues that the trial court erred when it refused to submit to the jury an instruction on whether Koko controlled the work being done by Mendoza. The motel was allegedly entitled to same because Mendoza was an independent contractor, and the owner/occupier of the land is not responsible for conditions created by an independent contractor unless the owner / occupier controlled the work being done. The case of *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex. 1997) is cited as support for the proposition. We disagree with Koko and overrule the issue.[4]

In *Clayton*, the Texas Supreme Court had before it a circumstance wherein the employee of an independent contractor (Olivo) fell from a pipe rack (while working at an oil and gas drilling site) and landed on drill pipe thread protectors that had been left on the ground by the previous shift. Olivo sued Clayton (the lease operator) and others, asserting causes of action sounding in premises liability, negligence, and gross negligence.

---

[4]We note that the issue before us does not involve the assignment of liability under circumstances wherein the land owner relinquished control over the premises or parts thereof to an independent contractor. Nor does Koko suggest that it lacked the right to control the premises themselves, including the area on which Mendoza worked and piled the material he excavated. Thus, the issue before us is whether 1) a motel owner/operator can invite motel guests to enter the establishment, 2) then escape liability when one of those guests is injured by a condition of which the owner/operator knows, 3) but which an independent contractor retained by the motel owner/operator created. In effect, we must answer whether the right to control the premises alone imposes liability when the known defect was created by neither the injured business invitee or those for whom he worked. Or, may a motel owner do nothing to protect those renting rooms from hazardous conditions simply because third parties hired by the motel but over whom the motel owner had no control created them?

4

However, only the theory of negligence was submitted to the jury even though Olivo's injury was caused by a condition of the premises, as opposed to active negligence. The jury then entered a verdict in favor of the plaintiffs, and the trial court entered a judgment upon that verdict. The Texas Supreme Court eventually reversed it.

Reversal was mandated, according to the Supreme Court, for several reasons. First, it concluded that because the injury arose from a condition of the property (*i.e.* the thread protectors being left on the ground) as opposed to a contemporaneous act of negligence, the suit was actually one for premises defect. *Clayton*, 952 S.W.2d at 529. Next, it stated that to recover against a general contractor for a premises defect, the injured plaintiff must establish both the general contractor's right to control the defect-producing work and a breach of that duty according to the traditional premises defect elements described in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983).[5] *Id.* Olivo was obligated to prove Clayton had a right to control because general contractors normally have no duty to insure that their independent contractors perform in a safe manner. *Id.* at 527; *see Coastal Marine Service of Texas, Inc. v. Lawrence,* 988 S.W.2d 223, 225-26 (Tex. 1999) (holding that a general contractor generally has no duty to insure that an independent contractor performs his work in a safe manner). And, it is the right to control that subjects general contractors to liability for the negligent activities of an independent contractor and the resulting conditions arising from those activities, according

---

[5]According to the court, a "general contractor in control of the premises is charged with the same duty as an owner or occupier." *Clayton*, 952 S.W.2d at 527. Thus, the duties applicable to both are synonymous in that both must use reasonable care to make and keep the premises safe for business invitees. *Id.*

to the court. *Clayton,* 952 S.W.2d at 528 *(citing Redinger v. Living, Inc.*, 689 S.W.2d 415 (Tex. 1985)). So, the court in *Clayton* held that before a general contractor could be liable for premises defects created by a subcontractor, the complainant had to prove and secure favorable findings on both the traditional premises defect elements and the right to control.

Yet, the court also acknowledged that the need to illustrate the right to control is not applicable in every situation wherein an independent contractor creates a hazardous condition. For instance, when the conditions exist on the premises at the time the invitee enters or were created by someone or something unrelated to the activity of the injured invitee or his employer, the right to control is irrelevant.[6] *Id.* at 527-28. Then, the general contractor or the one occupying the land must inspect the premises and warn invitees of dangerous conditions of which it knows or should have known. *Id.* at 527; *Shell Chemical Co. v. Lamb*, 493 S.W.2d 742, 746 (Tex. 1973); *Bryant v. Gulf Oil Corp.* 694 S.W.2d 443, 445-46 (Tex. App.—Amarillo 1985, writ ref'd n.r.e). And, though an opinion cited by Koko

---

[6]This is so because general contractors or those occupying the premises have no duty to warn an independent contractor of conditions caused by that contractor or its employees. *Pence Constr. Corp. v. Watson*, 470 S.W.2d 637, 638-39 (Tex. 1971). The subcontractor is deemed to know of the condition created by its employee, and the general contractor is not obligated to inform it of what it already knows. *Id.* Furthermore, the duty lies with the independent contractor to then inform its employees of the condition. *Id. (citing Delhi-Taylor Oil Corp. v. Henry*, 416 S.W.2d 390 (Tex. 1967)); *Bryant v. Gulf Oil Corp.* 694 S.W.2d 443, 445-46 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.) (holding that the duty to protect the employees of an independent contractor is that of the independent contractor, not the owner/occupier of the land). This allocation of duties indeed is instructive for another reason. It indicates that the rule in *Clayton* applicable to situations wherein the right to control must exist is restricted to circumstances wherein an employee of an independent contractor suffers injury from conditions caused by that contractor or its employees. Under those circumstances, the general contractor has no duty to warn the independent contractor or its employees since the independent contractor is deemed to know of the condition created by its employees and has the duty to then warn its other employees. *Pence Constr. Corp. v. Watson*, *supra*. And, those were the circumstances in *Clayton*; the thread protectors upon which Olivo fell were placed there by other employees working for the same independent contractor, Diamond M. So, Clayton (the general contractor) had no duty to warn Diamond M of what the latter was deemed in law to already know. And, more importantly, Diamond M had the duty to warn and protect its employee Olivo. So, unless Clayton had the right to control the activities of Diamond M or its employees at the time (which right carried with it the correlative duty to exercise it), Clayton would be insulated from liability.

6

insinuates otherwise, *Amara v. Lain*, 725 S.W.2d 734 (Tex. App.—Fort Worth 1986, no writ), we believe it wrongly decided for several reasons.

First, *Amara* does not comport with *Clayton* or *Shell*. Again, through the two latter opinions, the Supreme Court held that the general duty owed by an owner/occupier to an invitee applies when the injured did not create the condition or work for the entity which did. Since the injured children in *Amara* were clearly not employees of the independent contractor the test described in the foregoing sentence and mandated by the Texas Supreme Court should have applied. Yet, the *Amara* panel utilized another; that is, it utilized the one applicable when the injured either created the condition or worked for the entity that did. In short, it followed the wrong rule. Second, the decision fails to comport with §422 of the Restatement (Second) of Torts. There, we are told that:

> [a] possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, *is subject to the same liability as though he had retained the work in his own hands* to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure (a) while the possessor has retained possession of the land during the progress of the work, or (b) after he has resumed possession of the land upon its completion.

RESTATEMENT (SECOND) OF TORTS §422 (1965) (emphasis added). In other words, an owner/occupier of land has no duty to insure that an independent contractor performs its work safely. *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999). Yet, §422 illustrates that the owner/occupier cannot turn a blind eye to hazardous conditions created by the independent contractor when it (the owner/occupier) retains control of the property and continues to welcome invitees (who did not create or work for one who created the

7

condition) onto its premises. If this were not so, then the ramifications would be eye-opening. For instance, assume an independent contractor dug a large hole in front of a hotel room as per the work order of the innkeeper and that the innkeeper knew the contractor covered the hole with a thin tarp. Next, the unsuspecting guest while exiting his room stepped on the tarp, which gave way, and fell into the hole. According to the court in *Amara*, the innkeeper, who exercised no control over the work done by the independent contractor would escape liability simply because an independent contractor dug the hole. Nothing in *Clayton* or its predecessors or progeny reasonably supports such a result, though that is what *Amara* would permit. And, until the Supreme Court holds otherwise, we opt not to abide by a rule inconsistent with Supreme Court guidance or dictate.

At bar, no one argues that Mayo was an employee of Mendoza or that his presence at the hotel was somehow related to the activity being conducted by Mendoza. Similarly undisputed is that Mayo's actions did not create the condition which resulted in his fall. This being true, the duties discussed in *Clayton* and *Shell* and involving hazardous conditions made by individuals or entities other than the injured party or his employer are applicable here. Thus, Koko's right to control Mendoza's activities was irrelevant, and the trial court did not err when it omitted such an issue from its jury charge.

***Issues Two and Six— Insufficiency of the Evidence Proving Actual or Constructive Knowledge***

8

Through issues two and six, Koko argues that reversal is warranted because no evidence or factually insufficient evidence supports the finding that it had actual or constructive knowledge of the debris on which Mayo slipped. We overrule the issues.

### 1. Standard of Review and Applicable Law

The standards of review used in determining whether the evidence is legally and factually sufficient to support a verdict are thoroughly discussed in *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965) and *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951), respectively. No further explanation of the standards is needed.

Next, to recover upon a cause of action sounding in premises liability, the plaintiff must establish (among other things) that the owner/occupier of the grounds had actual or constructive knowledge of the condition that caused the injury. *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002). One may prove this element by showing that the defendant created the condition or actually knew of it or that it existed long enough to give the premises owner a reasonable opportunity to discover it. *Id.*

### 2. Application of Standard and Law

At bar, Mayo testified that Mendoza's trailer was filled with "rubble," "a big pile of . . . [it lay] against the wall" of the building, "rubble [was] everywhere," and "behind the trailer was a huge pile of rubble." The debris against the building appeared to be "stuff they couldn't fit in this" trailer, he also opined. Furthermore, upon his falling, injuring himself, and being assisted by others into the lobby of the motel, the desk clerk "came over" and asked what had happened. After Mayo explained the incident, the clerk said, ". . . I'm really sorry, I hope we can get maintenance to clean that up, we've told them about it" and

9

"we've been meaning to clean it up." The clerk also knew that "the work was going on outside and . . . it was messy" because "she had already told [him] that." Viewing this testimony and the reasonable inferences therefrom in a light most favorable to the verdict, as we must, *Raw Hide Oil & Gas,* 766 S.W.2d at 276, it constitutes much more than a scintilla of evidence upon which a reasonable factfinder could conclude that Koko actually knew of the condition that caused Mayo to slip and fall long enough to direct maintenance to clean it. Moreover, the finding is neither manifestly unjust or against the great weight and preponderance of the evidence.

To the extent that Koko believes the clerk's statements are no evidence of knowledge because they can equally be construed as illustrating that maintenance was contacted *after* Mayo fell, it is mistaken. It is true that circumstantial evidence from which equally plausible but opposite inferences may be drawn is too speculative to support a verdict. *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998). Yet, here, the evidence in question does not support the inference Koko suggests it does. What is missing from the record is any indication that the clerk left Mayo to call maintenance after he told her what occurred and then returned to tell him that maintenance had been contacted. The existence of such evidence would be necessary before anyone could reasonably say that the clerk was referring to a post-incident call to maintenance. Instead, what we have here is evidence of Mayo falling and then being helped into the lobby, the clerk leaving her station at the front desk to approach and ask him what happened, and then making the statements she did upon hearing his recitation of the events. Nowhere

10

is there any indication that the clerk knew of the accident before she approached Mayo or interrupted her conversation with him to order others to remove the debris.

### *Issue Three — Mistrial*

Under its third issue, Koko asserts that the trial court erred in denying its motion for mistrial. It was allegedly entitled to same because Mayo had interjected the issue of control into the trial via his negligent activity theory, non-suited that claim, and nonetheless continued to present evidence of control. This purportedly caused the "dynamics of the case" to change, permitted the admission of "plainly irrelevant and inadmissible [evidence of] remedial measures" and constituted "unfairness." We overrule the issue for several reasons.

First, in presenting evidence of control, Mayo did nothing more than that which Koko argued he had to do, *i.e.* illustrate that Koko had the right to control Mendoza's activities. We cannot fault a plaintiff for attempting to prove what a defendant mistakenly claims to be an element of the case.

Second, irrespective of what Koko may say, control remained an issue in the case even though the negligent activity theory was non-suited. The control of which we speak was not that involving the regulation of Mendoza's activities but rather Koko's control of the premises. If Koko lacked same then there would have been no foundation upon which to base recovery upon the claim sounding in premises defect. This is so because a landowner is not responsible for injuries arising from conditions created by an independent contractor on property over which the landowner relinquished possession or control. *See* RESTATEMENT (SECOND) OF TORTS §422 (1965); *Brownsville & Matamoros Bridge Co. v.*

11

*Null,* 578 S.W.2d 774, 782 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.). Moreover, evidence of subsequent remedial measures undertaken by the owner can be admitted to establish control over or the right to control the property. *See* Tex. R. Evid. 407 (stating that evidence of subsequent remedial measures may be admissible to prove control).

### *Issue Four — Admission of Expert Testimony*

Koko next argues that the trial court erred in failing to exclude the expert testimony of Dr. Gary Kronrad. Mayo retained Kronrad to render an opinion about Mayo's earning capacity, past and future. The report subsequently developed (a copy of which Koko received through discovery) and calculated Mayo's earning capacity based upon the supposition that Mayo would have been making $6000 to $8000 per week as a motion control expert. These calculations were tendered at trial. However, Mayo also had his expert calculate what his earning capacity would have been had he remained a rigger. The latter opinion had not been previously disclosed to Koko, though Koko had sought through discovery disclosure of the expert's opinions. Nor had Mayo previously disclosed the factual data upon which Kronrad based his new opinion, though the identity of the witness who actually supplied the data (*i.e.* Frank Stedtler) and the subject upon which Stedtler proposed to testify had been disclosed.[7] Moreover, by the time Kronrad was asked to discuss his new calculations, Stedtler had already testified, without objection, about what Mayo could have expected to earn as a rigger. Nevertheless, Koko objected

---

[7]Koko did not depose Stedtler prior to trial. Furthermore, Kronrad received the data from Stedtler about ten days to two weeks before trial.

12

to admission of the new calculations because they were not previously revealed via supplementation to discovery. The trial court overruled the objection. We overrule the issue.

### 1. Standard of Review and Applicable Law

Whether the trial court erred in allowing Kronrad to testify about the new calculations depends upon whether it abused its discretion. *National Liability and Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex. 2000). Whether it abused its discretion depends upon whether the decision failed to comport with controlling rules and principles or evinced capriciousness or arbitrariness. *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 499 (Tex. App. —Fort Worth 2001, pet. denied). And, finally, whether abused discretion warrants reversal depends upon whether it "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." Tex. R. App. P. 44.1(a)(1) & (2).

Next, a party's duty to amend or supplement written discovery regarding a testifying expert is governed by Texas Rule of Civil Procedure 193.5. Tex. R. Civ. P. 195.6. Per Rule 193.5, the duty to supplement or amend arises when a party learns that its previous responses to written discovery were incomplete or incorrect when made or no longer complete or correct. Tex. R. Civ. P. 193.5(a). In addition to the requirements imposed by Rule 193.5, a party must also amend or supplement any deposition testimony or written report of an expert that it retained, employed, or controlled. Yet, the duty extends only to the expert's mental impressions or opinions and the basis for them. Tex. R. Civ. P. 195.6. Moreover, caution must be taken in applying Rules 193.5(a) and 195.6 for neither prevents

13

an expert from refining his calculations and perfecting his report through time of trial. *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993); *Foust v. Estate of Walters*, 21 S.W.3d 495, 504 (Tex. App.—San Antonio 2000, pet. denied). For instance, in *Branham v. Brown*, 925 S.W.2d 365 (Tex. App.—Houston [1st Dist.] 1996, no writ), the expert based his prior findings upon a diagram that was not drawn to scale. When he received diagrams that were drawn to scale, he recalculated his findings using settled principles of math. This merely constituted a refinement of those prior findings which did not trigger the duty to supplement, according to the court. *Id.* at 370. Nor was supplementation required in *Lubbock County v. Strube*, 953 S.W.2d 847 (Tex. App.—Austin 1997, pet. denied), when the expert made additional calculations immediately before trial regarding the plaintiff's damages. Though the percentage of diminished earning capacity factored into the equation by the expert increased, the methodology or formula he used to derive the sums did not. And, because it did not, the appellate court held that Lubbock County had the requisite information it needed to "attack [the expert's] testimony . . . whatever the level of diminished earning capacity." *Id.* at 856. So, there was no "fundamental alterations that would constitute a surprise attack" and necessitate supplementation. *Id.*; *see West Texas Gathering Co.*, 868 S.W.2d at 304 (stating that the duty to supplement requires that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts).

Similarly, in *Navistar Intern. Transp. Corp. v. Crim Truck & Tractor Co.*, 883 S.W.2d 687 (Tex. App.—Texarkana 1994, writ denied) the reviewing court refused to hold that the new opinions of Navistar's expert had to be excluded. This was so because the new

14

opinions did not constitute a "material change in [the expert's] testimony" but rather evinced "an expansion on an already disclosed subject." *Id.* at 691. That is, the expert merely wanted to "put 'hard numbers' to his criticisms [of the opposing expert's opinions] and illustrate for the jury the difference this would make to [Crim Tractor's] damages." *Id.* at 690. Nor could the expert of Crim Tractor be prevented from changing his calculations at trial by "subtracting numbers that Navistar argued should not have been included in the first place." *Id.* at 692. Again, his new opinions were merely an expansion on topics previously discussed.

> 2. *Application of Standard and Law*

At bar, and much like the expert in *Navistar*, Kronrad was simply applying different data appearing of record into old methodology or formulas to voice an alternate opinion. That Koko had prior knowledge of the formulas or methodology being used is undisputed. Similarly beyond question is that Stedtler provided the trial court and jury with the new data without objection from Koko. Under these circumstances, and again much like the expert in *Navistar*, Kronrad merely functioned as a human calculator deriving sums from information already before the jury.

A litigant can hardly claim surprise when his opponent removes a calculator from his briefcase, inputs into it data already appearing of record, triggers the application of settled mathematical formulas to that data by pressing a button, obtains a result, and then presents the result to the jury. That is no less true when the calculator is a human being applying known mathematical formulas. In the latter situation, the expert is not materially changing his previous opinions but rather expanding on a subject already broached via

15

discovery and the presentation of evidence through other witnesses. In short, Kronrad merely performed mathematical computations like the expert in *Branham*, and allowing him to do so at trial was not an abuse of discretion.[8]

### *Issue Five — Past and Future Earning Capacity*

Next, Koko questions the legal and factual sufficiency of the evidence underlying the jury's awards for impairment to Mayo's past and future earning capacity. Simply said, he believes that the awards were not supported by the evidence. We overrule the issue.

*1.      Standard of review and applicable law*

The standards of review used in determining whether the evidence is legally and factually sufficient to support a verdict are thoroughly discussed in *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965) and *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951), respectively. No further explanation of the standards is needed.

Next, lost wages or earnings refers to the actual loss of income due to an inability to perform a specific job from the time of injury to the time of trial. *Strauss v. Continental Airlines, Inc.*, 67 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Border Apparel-East, Inc. v. Guadian*, 868 S.W.2d 894, 897 (Tex. App.—El Paso 1993, no writ). On the other hand, lost earning capacity concerns the impairment to one's ability to work. *Guadian*, 868 S.W.2d at 897. It entails the consideration of what the plaintiff's capacity to earn a livelihood actually was and assesses the extent to which it was impaired. *Id.* Moreover, courts recognize that calculating the extent of impairment constitutes an

---

[8]Whether our determination would have remained the same had Koko objected to and succeeded in excluding Stedtler's testimony is something about which we do not opine. Under that situation, the data would not have already been before the trial court.

16

exercise in uncertainty. *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (1943). So, much is left to the sound discretion of the jury. *Id.* This does not mean that it may simply journey into the realm of conjecture. Quite the contrary, its decision must be based upon such facts as are available in the particular case. *Id.*; *Strauss*, 67 S.W.2d at 436. The "damages [must also be] proved with that degree of certainty of which the case is susceptible." *McIver,* 169 S.W.2d at 712. And, "where the plaintiff seeks special damages for loss of his earning capacity in a particular business or profession, the amount of his earnings or the value of his services in that business must be shown with reasonable certainty." *Id.*

Next, the non-exclusive factors to be considered include the earnings of the injured party before and after the incident. *Id.* His stamina and ability to work with pain and the weakness and degenerative changes which naturally result from the injury and from long suffered pain also merit consideration. *Guadian*, 868 S.W.2d at 897 *(citing Springer v. Baggs*, 500 S.W.2d 541 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.)). So too does logic compel that the potential of the individual, or his ability to advance in skill, job, and pay, is also relevant, assuming that the potential can be reasonably extrapolated from the evidence of the particular case.

### 2. *Application of Standard and Law*

Appearing of record is evidence that Mayo was quickly progressing in the field of concert rigging. Though not yet the head rigger at the time of his accident, one witness (Stedtler) who had employed him before the accident testified that he would have hired

17

Mayo in that capacity for several particular concerts had he not suffered his foot injury. Furthermore, pay for that position approximated $3750 per week.

Next, Mayo's foot injury was not only painful, according to his testimony, but it also prohibited him from climbing. The latter was essential to being a rigger. And, though Mayo was capable of performing other jobs like carpentry and lighting, they paid less than the sums earned by riggers. Furthermore, to the extent those other jobs required standing for long periods of time, Mayo's injury, along with the accompanying arthritis, disabled him from doing that.

Also appearing of record is evidence illustrating that prior to his injury Mayo earned from $1500 to $2500 per week as a rigger, depending upon the concert. For instance, while on tour with Night Ranger, Bad Company and Ted Nugent, he received $1500 to $2000 per week. With the Grateful Dead, he earned up to $2500 per week. Those promoting Barbara Streisand's tour paid him $2400 to $2500 per week, and those promoting Phil Collins and Genesis paid him $2000 to $2250. These tours could last up to ten months, like that with Barbara Streisand. Furthermore, he would do "one off" shows that paid from $200 to $400 per day. Yet, after suffering his injury and realizing he could no longer be a rigger or pursue the status of head rigger, he took jobs as a carpenter during the tours of the Dixie Chicks, Barry White, and Metallica and lighting technician during the tours of Chicago and Bush. And, though he received $2000 per week when working as the head carpenter with the Dixie Chicks (a job he can no longer perform given the foot pain caused by standing), he was paid only $750 to $1100 by those promoting the Chicago and Bush concerts.

18

Next, Kronrad, the expert retained to calculate lost earning and earning capacity, opined that Mayo's lost earning capacity prior to trial approximated $270,000. This sum consisted of a $6600 loss in 1995, $27,000 in 1996, $93,000 in 1997, $27,000 in 1998, $36,000 in 1999, and $78,000 in 2000. Moreover, the sums for 1995 through 1999 represented the difference between what he was making before the injury while earning $2000 per week as a rigger and what he made after it as a carpenter and lighting technician.[9] The year 2000 calculation was based upon what he made before at $2000 per week as a number two rigger and what he could have made as a head rigger at $3750 per week had he not been injured.[10]

As to the impairment of future earning capacity, Kronrad compared the difference between what Mayo was making in the jobs he had been doing with the pay he could have made as a head rigger, *i.e.*, $3750 per week. Furthermore, the difference was then multiplied by 45, the latter representing the number of weeks Stedtler said Mayo could reasonably expect to work per year in that capacity. The sum derived was then multiplied by Mayo's life work expectancy (27 assuming retirement at 60 and 32 assuming retirement at 65). That sum was then reduced to present value. The loss derived if retirement occurred at 60 was $1,763,258 and at 65 was $2,018,780.

---

[9]Mayo testified that he was making, pre-injury, $100,000 per year. This amount consisted of income earned while on tour within the United States (which income would be reflected in his U.S. tax returns) and income earned outside the United States (which income would not be reflected on his U.S. tax return). Mayo was a citizen of Great Britain at the time.

[10]Again, Stedtler testified that he would have hired Mayo as the head rigger for that concert and others had he not suffered a foot injury.

19

Finally, the jury awarded Mayo $270,000 in lost earning capacity in the past and $1,200,000 for impairment to his future earning capacity. Comparison of each sum to the calculations of Kronrad illustrates that the awards do not exceed the range of loss described by the expert witness. Indeed, regarding future earning capacity, the jury found the loss to be from $500,000 to $800,000 less than what Kronrad calculated. And, because Kronrad's numbers were derived from evidence appearing of record, we cannot say that the jury awards enjoy no evidentiary support. Nor can we say that the awards were manifestly unjust or against the great weight and preponderance of the evidence.

Having overruled all issues or points of error, we affirm the judgment of the trial court.


Brian Quinn
Justice


Publish.