Opinion filed March 11,
2010

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-08-00097-CV

                                                    __________

 

             MID-CENTURY
INSURANCE CO. OF TEXAS, Appellant

 

                                                             V.

 

                                     SYNTHIA
MCLAIN, Appellee



 

                                   On
Appeal from the 42nd District Court

 

                                                            Taylor
County, Texas

 

                                                   Trial
Court Cause No. 45,958-A

 



 

                                              M E M O R A
N D U M  O P I N I O N

 








Synthia
McLain, the insured, sued Mid-Century Insurance Co. of Texas and its agent,
Larry Chapman, after her car wreck with Becky Morey. McLain had
uninsured/underinsured coverage under a policy written by Mid-Century and sold
to her by Chapman.  McLain’s lawsuit was for contractual claims under the
policy and for extra-contractual and bad faith claims.  The trial court granted
Mid-Century’s motion to sever and ordered that McLain’s extra-contractual and
bad faith claims against Mid-Century and Chapman be severed from the underlying
car accident claims.  The extra-contractual and bad faith claims were assigned Docket
No. 45,958-B. McLain’s claim in this case, made pursuant to her insurance
policy, was contractual in nature.  Henson v. S. Farm Bureau Cas. Ins. Co.,
17 S.W.3d 652 (Tex. 2000); Franco v. Allstate Ins. Co., 505 S.W.2d 789
(Tex. 1974).  Thus, this case was to establish the contractual obligation, if
any, of Mid-Century to pay under the uninsured/underinsured motorist (UIM)
provision of McLain’s insurance policy.  

A
jury found that Morey’s negligence was the cause of the accident and awarded
McLain $116,726:  $5,000 for physical pain and mental anguish sustained in the
past; $0 for pain and mental anguish in the future; $80,000 for loss of earning
capacity sustained in the past; $10,000 for loss of earning capacity in the
future; $500 for physical impairment sustained in the past; $0 for physical
impairment that would be sustained in the future; $11,226 for medical care in
the past; and $10,000 for future medical care.  The trial court also awarded
prejudgment interest.  Morey had settled with McLain and did not participate in
the trial.

 
After the verdict, Mid-Century put on evidence that its policy limit was
$20,000, that it had made personal injury payments (PIP) of $2,500, that it had
made a settlement offer of $1,500, and that McLain had received a settlement of
$21,500 from Morey.  At a hearing on entry of judgment, Mid-Century again urged
that these amounts be taken into consideration, citing Brainard v. Trinity
Universal Insurance Co., 216 S.W.3d 809 (Tex. 2006); Henson, 17
S.W.3d 652; and State Farm Mutual Automobile Insurance Co. v. Norris,
216 S.W.3d 819 (Tex. 2006).  Mid-Century argued that its liability under the
UIM provision should not exceed $20,000, pointing out that the
extra-contractual claims had been severed and were to be tried later.  Despite
the fact that it was her burden of proof, McLain contended that Mid-Century had
not introduced McLain’s policy during the jury trial and that it had failed to
establish the amount of the settlement from Morey.  And despite well-settled
law, McLain convinced the trial court to enter judgment against Mid-Century for
the entire $116,726 plus prejudgment interest.  The trial court also denied
Mid-Century’s motion for a judgment n.o.v. and for a new trial. 








Mid-Century
presents four issues on appeal: that the trial court erred in entering judgment
for the entire $116,726 in this first phase of a UIM case; that the evidence
was legally and factually insufficient to support the award of lost earning
capacity; that the evidence was legally and factually insufficient to support
the award of future medical expenses; and that it was incurable jury argument
for counsel for McLain to argue in closing that Mid-Century and its lawyer were
trying to “deceive” the jury because they believed the jury was “ignorant” and
that the jury should serve as the conscience of the community.  This argument
was made after counsel for McLain had repeatedly injected the idea of bad faith
on the part of Mid-Century during the entire trial from the time of voir dire
to closing.  The first, second, and fourth issues are sustained, and the case
is remanded for a new trial.

UIM
Coverage

The
Texas Insurance Code requires insurers to offer Texas motorists UIM coverage
and mandates that such coverage:

[P]rovide for
payment to the insured of all amounts that the insured is legally entitled to
recover as damages from owners or operators of underinsured motor vehicles
because of bodily injury or property damage, not to exceed the limit specified
in the insurance policy, and reduced by the amount recovered or recoverable
from the insurer of the underinsured motor vehicle.

 

Tex. Ins. Code Ann. § 1952.106 (Vernon
2009).[1] 

McLain’s
counsel erroneously argued to the trial court, and now to this court, that it
was Mid-Century’s burden to introduce McLain’s policy and the amount of any
settlement from Morey into evidence.  The long established Texas law is that a
plaintiff seeking recovery against an insurance company for injuries resulting
from the negligence of an uninsured motorist must plead and prove that, at the
time of the accident, the plaintiff was protected by uninsured motorist
coverage.  Members Mut. Ins. Co. v. Olguin, 462 S.W.2d 348, 350 (Tex. Civ.
App.—El Paso 1970, no writ); Members Mut. Ins. Co. v. Clancy, 455 S.W.2d
447 (Tex. Civ. App.—San Antonio 1970, no writ); Pan Am. Fire & Cas.
Co. v. Loyd, 411 S.W.2d 557, 560 (Tex. Civ. App.—Amarillo 1967, no writ). 
In the retrial of this case, McLain should introduce a copy of her policy and
establish her UIM coverage if she continues to contend that the policy
introduced by Mid-Century was not her policy at the time. 








Before
an insured is entitled to recover under a UIM policy provision, the insured
must establish the tortfeasor’s liability and the damages resulting from the
tortfeasor=s
negligence.  The UIM insurer is under no contractual duty to pay benefits until
the insured obtains a judgment establishing the liability and underinsured
status of the other motorist.  Brainard v. Trinity Universal Ins. Co.,
216 S.W.3d 809 (Tex. 2006); Henson, 17 S.W.3d at 654.[2]
 A motorist is underinsured if his or her liability insurance is
insufficient to pay for the injured party’s actual damages.  Stracener v.
United Servs. Auto. Ass’n, 777 S.W.2d 378, 380 (Tex. 1989).  Recovery from
UIM coverage may be had only for damages sustained in an amount in excess of
the total amount of the tortfeasor’s liability coverage.  Section 1952.106; Olivas
v. State Farm Mut. Auto. Ins. Co., 850 S.W.2d 564, 565 (Tex. App.—El Paso
1993, writ denied).  It was McLain’s burden to establish these elements to
prove that Morey was at fault and underinsured and that McLain’s damages
exceeded the amount recovered or recoverable from Morey.

McLain
argues that Mid-Century was required to plead, as affirmative defenses, policy
limits and any offset such as Morey’s coverage limits and Mid-Century’s PIP
payments.  For her position, McLain cites Southwestern Fire & Casualty
Co. v. Larue, 367 S.W.2d 162 (Tex. 1963).  However, Larue involved
an action on a promissory note against the maker of the note.  McLain’s
citation of Brown v. American Transfer & Storage Co., 601 S.W.2d 931
(Tex. 1980), and Tex. R. Civ. P.
94 on affirmative defenses is also not in point.  McLain has confused a
contractual condition precedent with an affirmative defense.  The court of appeals
in Henson held that the specific language in insurance contracts B “legally entitled to
recover” B creates a
condition precedent to a contractual obligation by insurance companies to
perform under a UIM provision.  Henson v. Tex. Farm Bureau Mut. Ins. Co.,
989 S.W.2d 837, 839 (Tex. App.— Amarillo 1999), aff’d, 17 S.W.3d at
654.  It was McLain’s burden to satisfy the condition precedent by establishing
that she was “legally entitled to recover” damages from Morey and that Morey
was an underinsured driver.  

After
the jury verdict, Mid-Century correctly established that it had paid PIP
benefits and made a settlement offer to McLain.  As pointed out in Brainard,
those amounts are to be taken into consideration in determining the amount of
prejudgment interest (that would have been owed by the underinsured motorist)
under the “declining principal” formula.  Brainard, 216 S.W.3d at 816. 
In Brainard, the supreme court held that UIM insurance covers
prejudgment interest that the underinsured motorist would have owed to the
insured and that prejudgment interest constitutes part of the damages caused by
the underinsured motorist.  On the other hand, the supreme court in Henson
held that, because UIM insurers do not breach their contractual obligation to
pay until tort liability is established, prejudgment interest against the UIM
insurer does not begin running until the liability of the
uninsured/underinsured motorist is established. See also Menix v. Allstate
Indem. Co., 83 S.W.3d 877 (Tex. App.—Eastland 2002, pet. denied).

McLain
attempts to distinguish Brainard, Henson, and Nationwide
Mutual Fire Insurance Co. v. Voight, 971 So. 2d 239 (Fla. Dist. Ct. App.
2008), the cases cited by Mid-Century, by arguing that in this case Mid-Century
undertook the defense of Morey and thereby undertook a duty to plead and prove
the amount of money paid by Morey or her insurer and a duty to plead and prove
McLain’s UIM coverage.  We disagree.  Mid-Century simply put McLain to her
burden of proof that she had to establish a contractual obligation of
Mid-Century to pay an amount under the UIM provision.   

The
trial court erred in entering judgment against Mid-Century for $116,726. 
Despite McLain=s
failure to introduce the policy, Mid-Century did introduce a copy of the policy
with its provision for $20,000 in UIM benefits.  At the outset of trial,
counsel for McLain told the court that the underinsured motorist had paid
McLain $20,100, that Mid-Century had paid her $2,500 in PIP benefits, and that
the UIM limit in her policy was $20,000.  The judgment against Mid-Century
should not have exceeded $20,000.  Mid-Century’s first issue is sustained. We
turn next to McLain’s burden of proof on her damages from Morey’s negligence. 
McLain had the burden to establish that her damages exceeded $22,600 ($20,100
settlement from Morey and $2,500 PIP benefits from Mid-Century).  

Loss
of Earning Capacity

            In
its second issue, Mid-Century argues that the evidence was legally and
factually insufficient to support the jury award of $80,000 for past lost
earning capacity and $10,000 for future lost earning capacity.  

Loss
of earning capacity is the plaintiff=s
diminished capacity to earn a living.  See Plainview Motels, Inc. v.
Reynolds, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied); Koko
Motel, Inc. v. Mayo, 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet.
denied).  Loss of earnings is the loss of actual income due to an inability to
perform a certain job that the person held before the injury.  Reynolds,
127 S.W.3d at 35. Loss of earning capacity is the proper measure of
damages, not loss of earnings, because even an unemployed person can recover
for lost earning capacity.  Id.  However, evidence of loss of earnings
is admissible to establish loss of earning capacity.  Id. at 35-36. 
When a plaintiff is employed at the time of his or her injury, the extent of
his or her loss can best be shown by comparing his or her actual earnings
before and after the injury.  See Strauss v. Cont’l Airlines, Inc., 67
S.W.3d 428, 436 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

McLain
had the burden to introduce evidence from which a jury could reasonably measure
in monetary terms her earning capacity prior to the injury.  Strauss, 67
S.W.3d at 435.  Although the amount of damages resulting from impairment of a
plaintiff’s earning capacity is largely within the discretion of the jury, the
jury should not be left to mere conjecture when facts appear to be available
upon which the jury could base an intelligent answer.  Id.  The damages
need to be proved with that degree of certainty of which the case is susceptible. 
Id. at 436.

Mid-Century
correctly states that McLain was required to prove (1) her earning capacity
before the accident in April 2003 and (2) her earning capacity after the
accident and before trial in November 2007, as well as her earning capacity in
the future.  Mid-Century concedes that there was some evidence through McLain’s
testimony as to the first element, but contends that evidence of the second
element was lacking.  

McLain
testified that, before the accident, she worked forty hours a week at $10 an
hour as an office aide for Hibbs & Todd, a civil engineering company.  Her
duties included filing and making copies of manuals that went with blueprints
to the job site.  In addition, she said that she worked “approximately eighteen
hours a week at the Buffalo Gap Store.”  There, she made $6 an hour.  McLain
stated that her back pain became unbearable because both jobs kept her on her
feet most of the time.  According to McLain, “very shortly after the wreck [she]
ended up leaving the Buffalo Gap store.”  She believed that she left Hibbs
& Todd during the first part of 2004, but she “would have to check to make
sure.”  Her testimony was evidence of her earning capacity before the accident,
but it was not the degree of certainty of which this case was susceptible. 
McLain could have easily provided her form W-2s from her employers, statements
from her employers, and her tax returns.

If
one assumes that McLain worked forty hours a week every week for Hibbs &
Todd and eighteen hours a week every week for the Buffalo Gap store, she would
have earned $508 per week or $26,416 per year.  McLain acknowledged that she
did not work forty hours a week every week for Hibbs & Todd because
sometimes she was sick, had to take care of her children, or took time for a
vacation.

Within
a few weeks of leaving Hibbs & Todd, McLain took a job as a substitute
teacher at the Jim Ned school.  As a substitute teacher, she earned $50 per
day.  There is no evidence on how often she worked as a substitute teacher; but,
apparently, she had the capacity to earn $250 per week if substitute teacher
jobs were available.  Subsequently, although the record does not reflect when,
she became a teacher’s aide at $7 an hour, working from “8:30 in the morning to
3:30 in the afternoon.”  She was a teacher’s aide from April 2004 until May
2007, working forty hours a week.  McLain said that she also tutored students
for $7 an hour for about five hours a week for three months during the summers
of 2005 and 2006.  She also worked at Albertson’s for either $6.50 or $6.75 an
hour for “between 14 and 21” hours a week.  At the time of trial, McLain was a
full-time student at Abilene Christian University with one year left to obtain
a degree in special education.  From her testimony, it appears that she
continued to work as a bus driver and at Albertson’s to help her husband
support their family.

We
are unable to determine from the record how the jury arrived at $80,000 for
past loss of earning capacity or $10,000 for future loss of earning capacity. 
Apparently, she wanted to stay with Hibbs & Todd, a job that she described
as a good one with benefits.  However, she could not because of her back pain. 
But even if we assume that she earned $508 per week before the accident, it is
not clear how much she earned or had the capacity to earn after the wreck. 
Also, the $508 per week was based on her working fifty-eight hours a week. 
After McLain left Hibbs & Todd, a number of her jobs appear to have been at
$7 per hour or $280 for a forty-hour week.  She testified that she left Hibbs
& Todd sometime during the first part of 2004.  The difference between $508
and $280 per week is $228 less earnings per week.  Assuming she left Hibbs
& Todd in January 2004, there were approximately 204 weeks between that date
and the date of trial in November 2007.  Multiplying $228 times 204 weeks
yields $46,512, a number far short of the $80,000 jury verdict.  There is, of
course, insufficient evidence to even support a verdict in the $40,000 range
because there was no evidence as to how many hours she actually worked before
the wreck and how many hours she worked after the wreck, much less any other
evidence of loss of earning capacity.  

The
record does not reflect how the jury arrived at $10,000 in future loss of
earning capacity. McLain acknowledged that, after she is a college graduate,
she will have an opportunity for greater earnings.

There
was a lack of medical evidence as to McLain’s loss of earning capacity.  McLain
testified that Dr. Daniel L. Munton did not take her off work because she
requested that he not do so.  She further testified that, after the procedure
by Dr. Munton, she felt like “her old self” for a period. In his deposition,
Dr. Munton stated, “No, I didn=t
recommend light duty.  I just recommended avoiding aggravating activity.”  Dr.
Munton specializes in physical medicine and rehabilitation; he treats people
who want to avoid surgery.

From
the record, it appears that McLain suffered a loss of earning capacity for some
period.  She should be commended for her decision to obtain a college degree;
however, loss of earnings due to her decision to pursue a college degree was
not a loss of earning capacity. There is insufficient evidence in the record to
support the awards of $90,000 for loss of earning capacity.  Mid-Century’s
second issue is sustained.

Future
Medical Expenses

Dr.
Munton testified that McLain underwent a procedure, known as a medial branch
block, where he tried to determine where her pain was coming from.  That
procedure uses needles up to eight inches long to inject a numbing medicine
called Marcaine.  After a few days, when her pain returned to the pre-injection
level, Dr. Munton then determined that McLain needed to undergo a procedure
termed “radiofrequency lesioning,” which he described as being similar to
cauterizing the nerves that appeared to be causing the pain.  That procedure
also utilized lengthy needles and was described by McLain as being quite
painful.  McLain had that procedure performed on October 2, 2003.  

McLain
returned to Dr. Munton on November 24, 2003, and on December 22, 2003, and said
that she felt pain in a different location.  Dr. Munton gave her the option of
therapy, chiropractic treatment, or medication, which she chose.  At the time
of his deposition in 2006, Dr. Munton had not seen her since 2003 because he
had moved to another city.  Before the trial, he had returned to Abilene. 
During his deposition, he testified that some patients will have their pain
return but that sixty to seventy percent of patients after a year are pain free
or continue to have reduced symptoms.

To
sustain an award of future medical expenses, the plaintiff must present
evidence to establish that, in all reasonable probability, future medical care
will be required and the reasonable cost of that care.  See Rosenboom Mach.
& Tool, Inc. v. Machala, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st
Dist.] 1999, pet. denied). The reasonable value of future medical expenses may
be established by evidence of the reasonable value of past medical expenses of
a similar nature.  See City of Rosenberg v. Renken, 616 S.W.2d 292, 293
(Tex. Civ. App.— Houston [14th Dist.] 1981, no writ).  The preferred method of
establishing future medical expenses is through expert testimony, but such
testimony is not required.  Nat’l Freight, Inc. v. Snyder, 191 S.W.3d
416, 426-27 (Tex. App.—Eastland 2006, no pet.).  

Dr.
Munton did not address whether in all probability McLain will need future
medical care, the type of care that would be required, and the reasonable cost
of that care in the future.  As to future treatment, Dr. Munton stated that
McLain might develop conditions that require surgery but that “[i]t would be
unlikely in her case.”  He repeated again that he could not recommend any kind
of surgical procedure, and his opinion was there was no need for spine
surgery.  McLain testified that she anticipated having to have the
cauterization process again in the future because the nerves grow back and have
to be cauterized.

According
to the medical records, Dr. Munton did see McLain again in January 2007.  Dr. Munton
wanted to determine the source of her pain by again performing a medial branch
block and having an MRI done, but McLain thought these were unnecessary.  They
agreed that she would again have another radio frequency medial branch
neurotomy that utilized the 32
inch radio frequency spinal needle.  Subsequent to the procedure, Dr. Munton
noted in February that McLain appeared to be “doing remarkably well.”  But on
June 7, 2007, McLain again visited Dr. Munton and told him that her pain level
had increased to level five.  Dr. Munton described her condition as chronic,
implying that she might have to undergo the procedure again in the future.  This
confirmed McLain’s testimony that she thought her nerves would grow back and
that she would need further treatments in the future.  In 2007, McLain’s
medical expenses for the treatment were approximately $1,200.  After reviewing
the records of the costs for the injections, office visits with Dr. Munton,
another possible medial branch block, and physical therapy, we cannot say that
the jury’s finding of $10,000 for future medical expenses was not supported by
sufficient evidence.  Mid-Century’s third issue is overruled.

Improper
Jury Argument

In
its fourth issue, Mid-Century argues that counsel for McLain engaged in
improper jury argument.  To obtain reversal of a judgment on the basis of
improper jury argument, Mid-Century must prove (1) an error (2) that was not
invited or provoked; (3) was preserved at trial by a proper objection, motion
to instruct, or motion for mistrial; and (4) was not curable by an instruction,
a prompt withdrawal of the statement, or a reprimand by the trial court.  Standard
Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979).  Our review of an
improper jury argument claim must cover the entire case, beginning with voir
dire and ending with closing argument. Id. at 840.  The complainant must
show that the probability that the improper argument caused harm is greater
than the probability that the verdict was grounded on the evidence.  Id. at
840. 

At
the pretrial conference, counsel for Mid-Century requested that the trial court
explain (or allow him to explain) at the outset to the jury the nature of the
case and the posture of the case.  He stated that a brief statement would give
the jury the context of the case and explain why Morey, the underinsured
driver, was not present and McLain’s insurance company was the defendant.  The
trial court denied this request.  However, the court did allow Mid-Century to
state during voir dire that this case was not about how the claim was handled
but was about the liability of Morey and the damages that resulted from the
accident McLain had with Morey.

            One
of the first statements by McLain’s attorney to the jury on voir dire was, “We
find ourselves in an odd situation in that Mrs. McLain’s own insurance company
is fighting against her.”  The court sustained Mid-Century’s objection, but
moments later, McLain’s counsel continued, “[E]ven though it’s against her own
insurance company, she has to prove and can only recover money.”  Then, the
following occurred:

[T]his lawsuit has
been here for three-and-a-half years.  The wreck has been -- it happened
four-and-a-half years ago, and within the last week they say for the first time
it’s her fault.  Who thinks that’s right?  If you do, raise your hand and let’s
talk about that.  Do you think that an insurance company owes better to their
insured than that?

 

            . . . .

 

            VENIREPERSON:
Yes.

 

            MR.
BURNETT: If they think that her injuries were caused by something else don’t
you think within four-and-a-half years they ought to bring a doctor, any doctor
--

 

 Counsel for
Mid-Century again objected, and the trial court sustained the objection. 
Counsel for McLain continued during voir dire to allude to the insurance
company as being in bad faith even though this case was solely about the
negligence of Morey and damages caused by her negligence.  McLain’s bad faith
claims had been severed into a separate case and were not involved in this
case.

           Questions
by the venire panel indicate the effect counsel for McLain had on the panel. 
One venireman asked counsel for Mid-Century, “But what about when the lady -- y’all
decided not to pay her, didn’t you?”  Counsel for Mid-Century answered, “No,”
but counsel for McLain immediately said, “I object to that.  That’s not true.” 
When the venireperson continued with, “My question is, someone somewhere had
already had to resolve the evidence to not pay her; the insurance company,” the
court intervened and said, “Well, that’s what the lawsuit is about.”  The court’s
statement was not helpful.  The venireperson may have interpreted the court’s
statement to mean that the lawsuit was over whether the insurance company had
in bad faith failed to pay an amount that it owed, not that it was a lawsuit to
determine whether the insurance company had any obligation at all under the UIM
provision.

           In
opening statement, counsel for McLain continued the same tactic that he pursued
during voir dire:

[T]here aren’t any
other doctors to indicate otherwise, and yet here we are on her uninsured underinsured
claim with this company and they haven’t paid a penny.

 

 Counsel for
Mid-Century again objected, stating that Mid-Century had no obligation to pay
at this point and that counsel’s statements were prejudicial and had no
relevance to this case.  The court sustained the objection, telling counsel, “Do
not do that again.”  The court instructed the jury to disregard counsel’s
statement, but overruled Mid-Century’s motion for a mistrial.

           McLain’s
counsel asked the investigating officer, “Did any of these artful questions by
this lawyer here change your opinion of who caused the wreck?”  Mid-Century’s
objection was sustained.

           In
questioning McLain, her counsel continued in the same vein:

            When was
the first time that you heard this company, your insurance company, say that
this wreck was your fault?

 

            . . . .

 

            You have
been telling this company that you were hurt, that it wasn’t your fault, for
four-and-a-half years, right?

 

           Although
it was McLain’s burden to establish her lost earning capacity, her counsel did
not produce any of her earning records.  Instead, he attempted to persuade the
jury that it was Mid-Century’s burden to negate her testimony as to where and
when she worked:

            Q.  Is
today the first time you have now heard they [Mid-Century] are quarreling with
you over your lost earning capacity?  

 

            A. 
Correct.  

 

            Q.   If
we had known about that we could have brought somebody in here with those
records, right?

            

The court sustained Mid-Century’s objection, but counsel’s next questions
were:

            Q.  Your
earning records are available and have been available to them for
four-and-a-half years, haven’t they?

 

            A. Yes.

 

            Q.  They
could have gone down to Hibbs & Todd, they could have called anybody they
wanted to and they would have give them that information, right?

 

The court again sustained
Mid-Century’s objection, but counsel continued:

 

            Q.  Has
anyone asked you, with this Defendant, to produce any records up until this
moment?

 

 The court again
sustained Mid-Century’s objection that counsel was misleading the jury with
respect to the burden of proof and with respect to the law that the jury would
be guided by in making its decisions.

           It is
apparent from the record that counsel for McLain created the impression that
Mid-Century owed duties that it did not owe and that the insurance company had
acted in bad faith.  Although the court sustained Mid-Century’s many objections,
the court’s actions had little effect.  In closing argument, counsel for McLain
argued:

You know now that
this insurance company, that these people, paid for this coverage.

 

            . . . .

 

            No
witness, no evidence, all they have is a lawyer that came down here armed with
a strong desire to deceive you. . . .  Does he think -- does this company think
that out here in Abilene we’re all so, I guess, ignorant that we can’t read a
doctor’s order . . . ?

 

[Y]ou don’t have to
get past tab one in the case in the medical records of the very first exhibit
to see how untruthful and disingenuous these people’s own insurance company is.

 

            . . . .

 

Now, how is it that
they can stand up here and say those things and expect you to be misled? . . . 
[T]hey have to deceive you into believing.

 

            . . . .

 

We know it’s been 1,672
days since this happened.  We know it’s been 1,672 days where this company
could have stepped up to the plate and honored its responsibility, and they
have failed entirely to do that.

 

           Counsel
for Mid-Century objected, and the objections were sustained, as they had been
throughout the case.  Counsel for McLain continued to imply that the insurance
was acting in bad faith in his rebuttal argument:

Do you really think
when this insurance company is talking to people --

 

            . . . .

 

To this insurance
company that means their insured did not complain of back pain.

 

            . . . .

 

And when you boil
this case down they’ve got to prove she’s a liar, and they can’t do it and it’s
driving them crazy.  They not only have to prove she=s a liar, they have to prove the police
officer was a liar.  They have to prove Doctor Munton was a liar.

 

            . . . .

 

I want you to be
able to say you righted a wrong, and that as the standard bearer and setter of
this community, this will not be tolerated.  I look forward to your verdict.

 

           Counsel
for McLain was well aware that McLain’s extra-contractual claims had been
severed from this case.  He points out that the court sustained Mid-Century’s
objections throughout the trial.  It is obvious from the record, however, that
the court’s rulings had no effect on counsel.

           In Living
Centers of Texas Inc. v. Peñalver, 256 S.W.3d 678, 680-81 (Tex.
2008), the supreme court stated that the complaining party “must show that the
argument by its nature, degree, and extent constituted such error that an
instruction from the court or retraction of the argument could not remove its
effects.”  Error as to improper jury argument must ordinarily be preserved by a
timely objection that is overruled.  Tex. Employers’ Ins. Ass’n v. Haywood,
266 S.W.2d 856, 858 (Tex. 1954).  Here, however, unlike the situation in Peñalver,
Mid-Century did object, and its objections were sustained; counsel for McLain
simply ignored them.

           Unsupported,
extreme, and personal attacks on opposing parties can compromise the basic
premise that a trial court provides impartial, equal justice.  See Standard
Fire Ins. Co. v. Reese, 584 S.W.2d 835, 840 (Tex. 1979).  As the supreme
court noted in Peñalver, the serious effects of arguments not
based on evidence or invited by opposing counsel are recognized in our Texas
Rules of Civil Procedure.  Rule 269 provides that, during final arguments, “[m]ere
personal criticism by counsel upon each other shall be avoided, and when
indulged in shall be promptly corrected as a contempt of court.”  Tex. R. Civ. P. 269(e).

           In
this case, counsel’s final arguments were made after he had consistently
emphasized to the jury during the entire trial that McLain’s own insurance
company had acted in bad faith.  That effect was not cured by the court’s
instruction during counsel’s argument.

           Counsel
for McLain first argues that Mid-Century invited and provoked the argument in
question because “Mid-Century waited over 32
years until days before trial to contest liability or assert that McLain’s
damages resulted from a preexisting condition and then challenged the
truthfulness of McLain on both liability and damages.”  Mid-Century had filed a
general denial at the outset.  It did file an amended petition just prior to
trial.  At a hearing on the amended petition, Mid-Century represented to the trial
court that its amended petition was only based on testimony already reflected
in the record.  The trial court ruled that it was timely filed.  Implicit in
its ruling was a premise that McLain should not have been surprised by the
amended petition.  After reviewing the record, we find that there was no abuse
of discretion in the trial court’s ruling.  

           Counsel
for McLain also argues that Mid-Century disregarded the fiduciary duties it
owed to its insured by stepping into the shoes of the underinsured motorist,
Morey.  For this argument, counsel relies on Allstate Insurance Co. v. Hunt,
450 S.W.2d 668, 671 (Tex. Civ. App.—Houston [14th Dist.] 1970), aff’d, 469
S.W.2d 151 (Tex. 1971).  In Hunt, the supreme court held that the trial
court did not abuse its discretion in ruling that Allstate could not
participate in defending the underinsured motorist.  The court emphasized that
Allstate had agreed to be bound by the insured’s suit against the other
motorist and had been granted a severance of the suit against it.  The supreme
court reasoned that Allstate had a primary duty to its insured and that the
insurance company would have conflicting duties if the “uninsured motorist
should later decide to bring a cross-action against the insured motorist, the
company would find itself under a duty to defend both antagonists.”  469 S.W.2d
at 153.  

           In
this case, the facts are quite different from those in Hunt.  There is
no basis in the record for an argument that Mid-Century owed a fiduciary duty
to McLain in this case.  Shortly after Hunt was decided, the court in Criterion
Insurance Co. v. Brown, 469 S.W.2d 484, 485 (Tex. Civ. App.—Austin 1971,
writ ref’d n.r.e.), pointed out the choices someone in Mclain’s position has:

[The insured] may
sue the insurance company directly without suing the uninsured motorist.  State
Farm Mutual Automobile Ins. Co. v. Matlock, 462 S.W.2d 277 (Tex. 1970). 
When the insured obtains the written consent of the insurance company, he may
sue the uninsured motorist alone, and that judgment binds the insurance
company.  Allstate Ins. Co. v. Hunt, supra.  The insured may proceed
against the uninsured motorist without the consent of the insurance company,
but the judgment in that suit will not be “conclusive,” (i.e. liability and
damages will have to be relitigated) in the suit against the insurance
company.  Allstate Ins. Co. v. Hunt, supra.

 

This is still
the law.  Soliz v. Cofer, No. 03-01-00246-CV, 2002 WL 821909 (Tex. App.—Austin
May 2, 2002, pet. denied); Gov’t Employees Ins. Co. v. Lichte, 792
S.W.2d 546, 548 (Tex. App.—El Paso 1990, writ denied).  

           Here,
the other motorist, Morey, was not involved because she had already settled
with McLain.  This suit was directly against Mid-Century.  Mid-Century was not
defending Morey; it was putting McLain to her proof on the issues of liability
and damages.  This case was only a suit on a contract and similar to automobile,
fire, life, theft, accident, wind, and workers’ compensation insurance cases
brought by an insured against its own insurer over contractual coverage. 
Counsel’s arguments to the jury were improper and incurable by the time they
were made.  Mid-Century’s fourth issue is sustained.

 

 

Conclusion

           To
establish her entitlement to underinsured motorist benefits, McLain was
required to establish the following: (1) that she had UIM coverage; (2) that
Morey’s negligence caused her damages and the amount of her damages; and (3)
that Morey was, in fact, underinsured.  State Farm Mut. Auto. Ins. Co. v.
Grayson, 983 S.W.2d 769 , 770 (Tex. App.—San Antonio 1998, no pet’n).

           McLain
did not introduce her insurance policy and failed to carry her burden of proof
to establish that she had uninsured/underinsured coverage from Mid-Century.  It
is basic law that when one sues on a contract, that person must first establish
that he or she had a contract. McLain also had the burden to provide evidence
of her settlement with Morey and the limits of Morey’s insurance to establish
that Morey was an underinsured motorist.  She failed to provide that evidence. 
However, Mid-Century did not contest the coverage and provided evidence to the trial
court that her policy provided for $20,000 in coverage.

           McLain
failed to provide sufficient proof to justify the jury’s award of $80,000 in
loss of past earnings capacity and $10,000 in loss of future earnings
capacity.  Final argument by counsel for McLain apparently influenced the jury
to give an award far in excess of the evidence.  

           It is
well settled that, in this case, Mid-Century’s liability for breach of contract
is limited to the amount stated in McLain’s contract.  From the record provided
by Mid-Century, it appears that amount was $20,000.  On retrial, the judgment
should not exceed $20,000.  

 This
Court=s Ruling

           The
judgment of the trial court is reversed, and the cause is remanded for a new
trial.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

March 11, 2010

Panel consists of:  Wright, C.J.

McCall, J., and Strange, J.









[1]Article 5.06-1(5) of the Insurance Code, which was a
former version of Section 1952.106, was in effect when McLain filed this suit. 
See former Tex. Ins. Code art.
5.06-1(5) (1981).  However, because the legislature made no substantive changes
to Article 5.06-1(5) in enacting Section 1952.106, we refer to the current
statute in the body of the opinion.

 





[2]If the insured proceeds against the uninsured motorist
without the consent of the insurance company, the judgment in that case will
not be conclusive; the liability of the uninsured motorist and damages will
have to be relitigated in the suit against the insurance company providing the
uninsured/underinsured coverage.  Criterion Ins. Co. v. Brown, 469
S.W.2d 484, 485 (Tex. Civ. App.—Austin, writ ref’d n.r.e.).